# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 25-50770

ALICIA JASMIN GONZALEZ MALDONADO, Individually and as personal representative of the Estate of JOSE RAFAEL ROMAN ROSADO, deceased, and mother, as next friend CMRG, a minor; JEREMY JOSE ROMAN GUZMAN; SEBASTIAN GABRIEL ROMAN SANTOS; JOSE ROMAN; CLARA ROSADO; NICOLETA IULIANA PADUREANU, Individually and as personal representative of the Estate of DAVID SAMUEL ALBANDOZ, deceased, and as mother, as next friend AIA, a minor; ROBERTO ESPADA VEGA, Individually and as personal representative of the Estate of ROBERTO ANGEL ESPADA GALI, deceased, et al,

*Plaintiffs-Appellants,*

v.

STANDARD AERO (SAN ANTONIO), INCORPORATED; STANDARD AERO REDESIGN SERVICES, INCORPORATED,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, SAN ANTONIO

## BRIEF FOR PLAINTIFFS-APPELLANTS

DONALD J. NOLAN
THOMAS P. ROUTH
THOMAS J. ELLIS
NOLAN LAW GROUP
20 North Clark Street, 30th Floor
Chicago, Illinois 60602
(312) 757-3179
djn@nolan-law.com
tpr@nolan-law.com

STEPHEN I. VLADECK
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-9313
svladeck@gmail.com

BRADLEY STOLL
KATZMAN, LAMPERT, & STOLL
121 North Wayne Avenue, Suite 205
Wayne, Pennsylvania 19087

*Attorneys for Plaintiffs-Appellants*

CP COUNSEL PRESS     (800) 4-APPEAL • (624918)

## CERTIFICATE OF INTERESTED PERSONS

No. 25-50070

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Alicia Jasmin **GONZALEZ MALDONADO**, individually and as personal representative of the Estate of Jose Rafael Roman Rosado, deceased, and mother, as next friend CMRG, a minor; Jeremy Jose Roman Guzman; Sebastian Gabriel Roman Santos; Jose Roman; Clara Rosado; Nicoleta Iuliana Padureanu, individually and as personal representative of the Estate of David Samuel Albandoz, deceased, and as mother, as next friend AIA, a minor; Roberto Espada Vega, individually and as personal representative of the Estate of Roberto Angel Espada Gali, deceased, et al.,

*Plaintiffs-Appellants*

*v.*

**STANDARD AERO (SAN ANTONIO), INC.**; Standard Aero Redesign Services, Inc.,

*Defendants-Appellees*

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate potential disqualification or recusal:

ii

## CERTIFICATE OF INTERESTED PERSONS (CONTINUED)

### I.    Plaintiffs-Appellants

**The *Roman Rosado* Plaintiffs**

1. Jose Rafael Roman Rosado
2. Alicia Jasmin Gonzalez Maldonado
3. Jeremy Jose Roman Guzman
4. Sebastian Gabriel Roman Santos
5. Cateleya Marina Roman Gonzalez
6. Jose Roman
7. Clara Rosado

**The *Perez Serra* Plaintiffs**

8. Carlos Miguel Perez Serra
9. Veda Liz Cruz Rivera
10. Giancarlo Perez Nazario
11. Ariana Marie Perez Nazario
12. Diego Armando Perez Cruz
13. Carmen Serra

**The *Albandoz* Plaintiffs**

14. David Samuel Albandoz
15. Nicoleta Iuliana Padureanu
16. Aeliana Irene Albandoz
17. Jose M. Albandoz
18. Rosa J. Garcia

**The *Paravisini Ruiz* Plaintiffs**

19. Jan Antoine Paravisini Ruiz
20. Jean Paul Paravisini Rivera
21. Antoinette Marie Paravisini Rivera
22. Paola Alejandra Paravisini Rivera
23. Antonio Paravisini
24. Xenia Ruiz

**The *Audiffred Rivera* Plaintiffs**

25. Jean Michael Audiffred Rivera
26. Aileen Ortiz Flores
27. Michael Alexander Audiffred Ortiz

iii

**CERTIFICATE OF INTERESTED PERSONS (CONTINUED)**

28. Jensen Andre Audiffred Ortiz
29. Juan Audiffred
30. Isabel Rivera

**The *Colon Camacho* Plaintiffs**

31. Victor Jorge Colon Camacho
32. Soldelix Gonzalez Rivera
33. Valeria Del Mar Colon Gonzalez
34. Camelia Sofia Colon Gonzalez
35. Victor Colon

**The *Circuns Gonzales* Plaintiffs**

36. Eric Raul Circuns Gonzales
37. Lourdes Maria Perez Romero
38. Eric Xavier Circuns Perez
39. Eric Raul Circuns Quiros

**The *Espada* Plaintiffs**

40. Roberto Espada
41. Roberto Espada Vega
42. Luis Daniel Espada Gali
43. Gladitza Garcia Gali

## II. Counsel for Plaintiffs-Appellants

44. Thomas A. Crosley
45. Crosley Law Firm, P.C.
46. Thomas J. Ellis
47. Glenn A. Garber
48. Glenn A. Garber, P.C.
49. Katzman, Lampert, & Stoll
50. Michael S. McCardle
51. Donald J. Nolan
52. Nolan Law Group
53. Rob Rickner
54. Rickner PLLC
55. Thomas P. Routh
56. Bradley J. Stoll
57. Stephen I. Vladeck

iv

### CERTIFICATE OF INTERESTED PERSONS (CONTINUED)

## III.  Defendants-Appellees

58.  Standard Aero (San Antonio), Inc.
59.  Standard Aero Redesign Services, Inc.

## IV.  Counsel for Defendants-Appellees

60.  Stuart Bradley Brown, Jr.
61.  Stephen A. Calhoun
62.  Emily M. Carlton
63.  Jackson Walker LLP
64.  Justin Vance Lee
65.  Cody Andrew Martinez
66.  Elizabeth Walsh Pittman
67.  Vinson & Elkins L.L.P.

## V.  District Court Judges

68.  Hon. David Alan Ezra
69.  Hon. Richard B. Farrer

* * *

Respectfully submitted,


/s/ Stephen I. Vladeck

Stephen I. Vladeck
Counsel for Plaintiffs-Appellants

v

## STATEMENT REGARDING ORAL ARGUMENT

This Court should grant oral argument. Plaintiffs-Appellants' appeal raises important questions about the scope of the government contractor defense recognized by the Supreme Court in *Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988)—questions that this Court has never previously decided and with respect to which it is likely to benefit from oral argument in addition to the parties' briefs.

vi

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT.................................................v

TABLE OF AUTHORITIES.........................................................................viii

JURISDICTIONAL STATEMENT ................................................................. 1

ISSUE PRESENTED FOR REVIEW .............................................................. 1

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE CASE....................................................................... 7

   A.  FACTUAL BACKGROUND ................................................................ 7

      1.  SASAI's Maintenance Did Not Conform to Specifications ..... 10

      2.  SASAI Did Not Test its Work as the Contract Required ....... 13

      3.  The Government Re-Took Possession of the Compressor Without Inspecting or Testing for Conformance .................... 17

      4.  SASAI's Negligent and Non-Conforming Maintenance Proximately Caused the Crash ............................................. 19

   B.  PROCEDURAL BACKGROUND............................................................21

SUMMARY OF ARGUMENT ....................................................................26

ARGUMENT..........................................................................................28

   I.  STANDARD OF REVIEW ...............................................................28

   II.  THE DISTRICT COURT WRONGLY HELD THAT THE GOVERNMENT'S "ACCEPTANCE" AND "USE" OF A COMPONENT CONCLUSIVELY ESTABLISHES CONFORMANCE UNDER *BOYLE* .................................28

      A.  The Purpose of *Boyle* is to Prevent Holding Contractors Liable Only for Torts Caused by Their Adherence to Government Contracts............................29

vii

## TABLE OF CONTENTS (CONTINUED)

B.  Government Acceptance and Extensive Use of an Overhauled Component Provides Inferential—but Not Conclusive—Evidence of Conformance ........................... 33

C.  The District Court Erred by Treating the Government's Acceptance and Use of the Compressor as Conclusive Evidence of Conformance ....................................... 36

D.  The District Court Erred in Concluding that the Government's Use of the Compressor Was "Extensive" ......... 42

III. THE GOVERNMENT HAD NO KNOWLEDGE THAT IT WAS ACCEPTING A NON-CONFORMING COMPONENT ................................ 45

A.  The District Court Should Have Excluded Evidence Arising from the Williams Declaration and the Beach Affidavit ................................................... 46

B.  The Wrongly Included Evidence Does Not Establish the Government's Knowledge of Non-Conformance ............... 49

C.  Applying *Boyle* to These Facts Would Invert the Principle for Which That Case Stands ................................... 51

CONCLUSION ................................................................................ 55

CERTIFICATE OF SERVICE ............................................................ 56

CERTIFICATE OF COMPLIANCE ..................................................... 56

viii

## TABLE OF AUTHORITIES

### Cases

*Bailey* v. *McDonnell Douglas Corp.*,
989 F.2d 794 (5th Cir. 1993)................................................. 30, 31, 32, 33

*Boyle* v. *United Technologies Corp.*,
487 U.S. 500 (1988)...................................................... 1, 6, 29, 36, 53, 54

*Brand Servs., L.L.C.* v. *Irex Corp.*,
909 F.3d 151 (5th Cir. 2018)........................................................7

*Campbell-Ewald* v. *Gomez*,
577 U.S. 153 (2016).................................................................54

*Corr. Servs. Corp.* v. *Malesko*,
534 U.S. 61 (2001) ..............................................................3, 28

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)................................................................22

*Groton* v. *Warren Pumps, LLC*,
No. 1:17-1110, 2023 WL 3848412 (M.D. Pa. June 6, 2023) .................34

*Hendrix* v. *Bell Helicopter Textron, Inc.*,
634 F. Supp. 1551 (N.D. Tex. 1986) .................................................35

*Hudgens* v. *Bell Helicopters/Textron*,
328 F.3d 1329 (11th Cir. 2003).................................................22, 33

*In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*,
81 F.3d 570 (5th Cir. 1996)..........................................................44

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
897 F.2d 626 (2d Cir. 1990) ..........................................................3

*In re Katrina Canal Breaches Litig.*,
620 F.3d 455 (5th Cir. 2010).........................................................3

*In re Oil Spill by the Oil Rig "Deepwater Horizon"
in the Gulf of Mexico, on April 20, 2010*,
MDL No. 2179, 2012 WL 85447 (E.D. La. Jan. 11, 2012) ...................49

*Kerstetter* v. *Pac. Sci. Co.*,
210 F.3d 431 (5th Cir. 2000)..........................................................42

ix

## TABLE OF AUTHORITIES (CONTINUED)

*Latiolais* v. *Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (en banc) ................................................53

*Martinez* v. *Sci. Apps. Int'l Corp.*,
   No. 1:10-CV-207, 2015 WL 11109381 (S.D. Tex. June 29, 2015) ........35

*McGonigal* v. *Gearhart Industries, Inc.*,
   851 F.2d 774 (5th Cir. 1988) ................................................... 30, 31, 32

*Miller* v. *Diamond Shamrock Co.*,
   275 F.3d 414 (5th Cir. 2001) ........................................................ 33, 43

*Miller* v. *United Techs. Corp.*,
   660 A.2d 810 (Conn. 1995) ........................................................... 35, 41

*Mitchell* v. *Lone Star Ammunition, Inc.*,
   913 F.2d 242 (5th Cir. 1990) ................................................... 30, 31, 32

*Quiles* v. *Sikorsky Aircraft*,
   84 F. Supp. 2d 154 (D. Mass. 1999) ................................................35

*Reingold* v. *Swiftships, Inc.*,
   126 F.3d 645 (5th Cir. 1997) ...................................................... 7, 23, 28

*Sewell* v. *Sewerage & Water Board of New Orleans*,
   No. 15-3117, 2016 WL 7385701 (E.D. La. Dec. 20, 2016) ...................35

*Smith* v. *Regional Transit Auth.*,
   827 F.3d 412 (5th Cir. 2016) ...............................................................28

*Smith* v. *Xerox Corp.*,
   866 F.2d 135 (5th Cir. 1989) ...............................................................34

*Takacs* v. *Am. Eurocopter, L.L.C.*,
   656 F. Supp. 2d 640 (W.D. Tex. 2009) ...............................................33

*Trevino* v. *Gen. Dynamics Corp.*,
   865 F.2d 1474 (5th Cir. 1989) ................................................... 6, 30, 41

*Yearsley* v. *W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940) ..............................................................................54

*Zeringue* v. *Crane Co.*,
   846 F.3d 785 (5th Cir. 2017) ...............................................................53

x

## TABLE OF AUTHORITIES (CONTINUED)

### Statutes

28 U.S.C.

§ 1291 ........................................................................................ 1

§ 1331 ........................................................................................ 1

§ 1441 ........................................................................................ 1

§ 2680(a) ............................................................................. 6, 29

### Other Authorities

FED. R. CIV. P. 56(c)(4) ............................................................ 48

FED. R. EVID. 702 ................................................................... 22

\* \* \*

1

## JURISDICTIONAL STATEMENT

The district court entered a final judgment dismissing Plaintiffs-Appellants' claims on August 22, 2025. ROA.5808 (judgment). Plaintiffs-Appellants timely noticed their appeal on September 18, 2025. ROA.5816.[1] The district court exercised jurisdiction under 28 U.S.C. §§ 1331 and 1441; this Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

1) Is a government maintenance subcontractor entitled to summary judgment under *Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988), when the only evidence that it conformed to contract specifications in overhauling a component is the government's taking possession and brief use of the component, and when (a) the plaintiffs adduced substantial direct evidence of *non*-conformance; (b) the government was unaware of (and did not accept) the non-conformance when it took possession of and used the component; and (c) the component failed just 35 operational hours later?

## INTRODUCTION

Plaintiffs-Appellants [hereinafter "appellants"] are the surviving family members of eight Puerto Rico Air National Guardsman who were killed in the May 2, 2018 crash of a WC-130H airplane in Savannah, Georgia. The crash occurred shortly after takeoff when the aircraft's number-one engine suffered a malfunction in its compressor—causing

---

1. The Notice of Appeal in the Electronic Record on Appeal is the corrected, redacted notice filed on September 25, 2025. The appeal was initially noticed, without redactions, on September 18. *See* ROA.49 (docket sheet notation for ECF 211).

the aircraft to depart from controlled flight. The compressor failed just 35 operational hours after Defendant-Appellee Standard Aero (San Antonio), Inc. [hereinafter "SASAI"] overhauled it and certified to the federal government[2] that its work conformed to the relevant contract specifications. That certification was false.

Through its shoddy maintenance, SASAI machined the compressor blades in a way that exceeded the contract's hyper-specific tolerances; it incorrectly installed the compressor rotor in a way that produced a destabilizing asymmetry; and it sealed those dangerous conditions within the compressor case where they could not have been detected without disassembling the compressor. More than that, discovery in the district court adduced no proof that SASAI either measured the results of its work or tested the compressor before returning it to the government—even though both checks were required by the contract.

The government did not meaningfully supervise, or otherwise know about, SASAI's shoddy maintenance. When it re-took possession of the

---

2. This case involves a number of different federal government actors—from the Air Force to the Defense Contract Management Agency (DCMA) to the Puerto Rico Air National Guard. Except where specificity is relevant, and for ease of reference, appellants refer to all of these actors throughout as "the government."

3

compressor, it had no knowledge of the myriad ways in which SASAI's work had failed to conform to the contract specifications. Taking SASAI's certification of conformance at face value, the government installed the compressor into an engine, and then installed the engine onto the accident aircraft—where, just eight flights later, it failed.

As this Court has long made clear, "[t]he government contractor defense in *Boyle*, '[s]tripped to its essentials,' is fundamentally a claim that '[t]he Government made me do it.'" *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 465 (5th Cir. 2010) (quoting *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990) (alterations in original)); *see also Corr. Servs. Corp.* v. *Malesko*, 534 U.S. 61, 74 n.6 (2001) (*Boyle* forecloses state tort liability "[w]here the government has directed a contractor to do the very thing that is the subject of the claim"). Here, the gravamen of appellants' claim is that SASAI did *not* do what the contract required—an allegation for which appellants adduced an overwhelming amount of physical evidence and expert testimony in the district court, and which the district court did not discredit; it merely observed that "there are competing experts on this issue." ROA.5796 (district court op. at 22).

4

And yet, despite those disagreements, Judge Ezra granted SASAI's motion for summary judgment. Specifically, he concluded that, because the government "inspected" the compressor, re-took possession of it, and (briefly) used it, precedent from this Court and others holding that the government's "extensive acceptance and use" of a component *can* establish conformance under *Boyle* sufficed to *conclusively* establish SASAI's conformance here, ROA.5796–5803 (district court op. at 22–29), notwithstanding appellants' voluminous direct evidence to the contrary.

Judge Ezra's ruling was erroneous in three separate—but equally problematic—ways. First, it wrongly treated the government's possession and brief use of the compressor as conclusive evidence of conformance under *Boyle*, when an unbroken line of rulings from this and other courts have made clear that acceptance and *extensive* use give rise merely to an inference of conformance—one that can be overcome by direct evidence of non-conformance. Second, Judge Ezra failed to credit the substantial, direct evidence of three different types of non-conformance adduced by appellants in discovery: (1) non-conformance in the maintenance itself; (2) non-conformance in the means by which SASAI measured the results of its maintenance; and (3) non-conformance in the lack of testing SASAI

5

undertook to quality-check its work. That evidence necessarily created questions of material fact as to whether SASAI did *not* conform to the contract specifications notwithstanding the government's possession and limited use of the overhauled compressor.

Third, Judge Ezra gave too *much* weight to the government's role in "auditing" and "inspecting" SASAI's compliance with the contract—by relying upon evidence that should have been excluded, and that, in any event, does not support the conclusions the district court drew from it. Appellants introduced substantial evidence in the district court that the government did not know about SASAI's non-conforming maintenance and SASAI adduced no direct evidence to the contrary. At the very least, appellants' evidence gives rise to yet another question of material fact that should have militated against a grant of summary judgment.

The district court's decision not only reflects a significantly erroneous misapplication of *Boyle*; it would, if affirmed, effectively foreclose any and all tort liability for negligent maintenance by government contractors. After all, if a government contractor's liability for negligent maintenance evaporates whenever the government takes possession of (and, as here, uses even minimally) the underlying

6

component, any claims for harm arising from the use of the component would necessarily be nullified. That result would be a problem not just for those who are injured (or, as in this case, killed) in the accidents that will inevitably result; it would be a problem for the *government*. The district court's holding would foster complacency in contractors who are insulated from liability for their own misconduct not just from the tort victims, but from the government itself. And it would instead pass the burden onto the government to find other (expensive) ways of verifying conformance before re-taking possession of overhauled components, or to (even more expensively) conduct the maintenance itself.

The animating purpose of Justice Scalia's opinion for the *Boyle* Court was to foreclose state tort liability only in circumstances in which its availability would inexorably affect discretionary decisions by the military—which are themselves shielded from liability under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). *See Boyle*, 487 U.S. at 511; *see also Trevino* v. *Gen. Dynamics Corp.*, 865 F.2d 1474, 1486 (5th Cir. 1989) ("*Boyle* protects government contractors from liability for defective designs if discretion over the design feature in question was exercised by the government."). Here, the record shows that the government

demanded a conforming component and was told by SASAI that the component conformed even though, unbeknownst to the government, it did not. The district court thus erred in granting summary judgment under *Boyle*. And if this Court were to affirm, the result would be to pass along to the government the very costs that *Boyle* exists to foreclose. For these reasons, the district court's grant of summary judgment should be reversed, and the case should be remanded for further proceedings.

STATEMENT OF THE CASE

### A.  Factual Background[3]

The Lockheed Martin WC-130H aircraft at issue in this case, serial number 4110, with military registration 65-0968, used four T-56-A-15 Allison turbo-prop engines—known as "T56" engines. The accident in this case was caused by a failure in the "number-one" T56 engine—the one circled in the below exemplar image:

---

3. This Court "review[s] a district court's grant of summary judgment *de novo*, applying the same standard of review as would the district court." *Brand Servs., L.L.C.* v. *Irex Corp.*, 909 F.3d 151, 155–56 (5th Cir. 2018) (internal quotation marks omitted). As relevant here, "[o]n summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion," *i.e.*, the appellants. *Reingold* v. *Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997). Thus, and because the district court did not discredit any of the evidence introduced by appellants below, the Statement of the Case recounts the factual background from the perspective of the evidence adduced by appellants.

8



ROA.4442. The specific component at issue in this case is the T56 engine's compressor module:



ROA.4444. As these images from the district court record depict, the T56 engine's compressor assembly is cylindrical—and is enclosed by a case consisting of four bolted quadrants (which can't be opened without removing the bolts). The compressor interior contains fourteen stages of "blade lands" over which the compressor's rotor blades pass:

## Compressor Module with Stages



Bleed air valve mounts | Compressor Case (cutaway above)

ROA.4444.

During operation, air is drawn into the compressor through an inlet duct. The compressor incrementally increases pressure as airflow passes from the first stage though to the fourteenth stage. The compressor is designed to compress air to 9.5 times its state when it enters the inlet. The compressed airflow is then routed to the combustion chamber, where it is mixed with fuel and ignited to create the physical force that ultimately turns the propeller. ROA.4414.

10

As this (brief) summary underscores, hyper-specific technical precision in the machining and maintenance of the T56 engine's compressor module is essential to the engine's proper functioning.

**1. SASAI's Maintenance Did Not Conform to Specifications**

To maintain WC-130H aircraft like the accident aircraft in this case, the U.S. Air Force had a prime contract with Lockheed Martin Kelly Aircraft Center. SASAI, in turn, was a party to a ("bridge") subcontract with Lockheed Martin Kelly Aircraft Center—specifically to provide maintenance overhaul work on T56 engines. ROA.806–13. Among other things, the subcontract required SASAI to perform compressor overhaul work in accordance with Technical Order 2J-T56-53—which includes three "Work Packages" specifically at issue here: Work Package (or "WP") 138 (concerning blade land machining); WP 150 (concerning rotor balancing); and WP 158 (concerning compressor assembly). ROA.2812. Those three contract-based specifications are at the heart of this case.[4]

---

4. Several exhibits, including the Work Packages, were filed in the district court only under seal. Those exhibits are not part of the Electronic Record on Appeal, but are cited where appropriate to the attachments to the relevant motions to file under seal in the district court—and thus can be viewed by those with access via ECF. Because their contents (and requirements) are not disputed, Appellants have not moved to file those exhibits under seal in this Court.

11

In particular, WP 138 requires the inner diameter of the compressor case at stages one through nine to be machined to measurements falling within 14.728 in. ± 0.002 in. permitted variance, and stages ten through fourteen to be machined to measurements falling within 14.734 in. ± 0.002 in. permitted variance. And between them, WP 150 and WP 158 require technicians to install the compressor rotor assembly so that it is balanced and aligned symmetrically within the compressor case. ROA.4415 (citing ECF 141-1, App. 425).

During its overhaul of the compressor at issue, SASAI used a vertical turret lathe to machine the inner diameter of the compressor case. However, it negligently over-machined the inner diameter of the case and mis-installed the rotor in an *a*symmetric manner. ROA.4416–17. Appellants' experts performed precise computerized laser measurements of the blade land diameters in two of the compressor case's four quadrants.[5] Those measurements confirmed that SASAI's machining at compressor stage nine exceeded the permissible value by

---

5. Because measurements were taken from undamaged areas of the compressor blade lands and in areas where overhaul machining was present, appellants' expert confirmed that the measurements depicted the values created during SASAI's overhaul. ROA.4416 (citing ECF 141-1, App. 71–73).

.021 inch in one of the quadrants and by .074 inch in the second. And the inner diameter of the compressor blade lands at stages ten through fourteen exceeded the permissible value by .023, .058, .069, .061, and .061 inch, respectively, in one quadrant; and by .074, 049, .060. 044, 043, .035 inch, respectively, in the second. ROA.4422 (citing ECF 141-1, App. 70, 109, 111). Given that the permissible variance was limited to ± 0.002 inches, this testimony provided direct evidence of non-conformance with the specifications for WP 138.

SASAI presented no evidence that it properly machined the compressor. It presented only a pre-overhaul Shop Order (Shop Order "Q8546") that identified the specifications to which it was *supposed* to conform. ROA.2995–99. But SASAI presented no evidence establishing that the Shop Order depicted the actual measurements resulting from its maintenance. And appellants presented evidence establishing that the values in the Shop Order mirrored the specifications to the thousandth of an inch, and would be impossible to obtain to such exactitude by machining. ROA.4423–24 (citing ECF 141-1, App. 504).

Appellants' experts also evaluated the inner blade lands for evidence of blade contact and identified an isolated area of blade rub

13

which occurred during engine operation—evidence that the case was re-assembled by SASAI with non-axisymmetry, ROA.4416–17 (citing ECF 141-1, App. 31, 305, 325, 510–12, 513–15, 519–21), as depicted below:



ROA.3543. Thus, appellants' expert evidence also established a genuine question of material fact as to whether SASAI had complied with WP 150 and WP 158—because a properly installed rotor cannot create "isolated" patches of contact with the case; any contact should be uniform.

### 2. SASAI Did Not Test its Work as the Contract Required

In addition to its non-conformance with the contract's specific maintenance requirements themselves, appellants also adduced evidence in the district court that SASAI failed to measure its machining

14

consistent with the requirements of the contract, and that it never tested the compressor's performance once the maintenance was completed, also in non-conformance to the contract.

Taking the measurements first, in response to appellants' experts' testimony about the non-conforming blade land diameters, the only evidence SASAI introduced to demonstrate conformance was Shop Order Q8546, which, as noted above, reflects the exact nominal values (to the thousandth of an inch) that were *supposed* to be achieved, but which no testimony or affidavit confirms were ever reached. ROA.2998 (Shop Order Q8546). Indeed, SASAI's own corporate representative, Mr. Art Sepulveda, confirmed in deposition testimony that the measurements in the Shop Order were posted *prior* to the performance of the work—and, thus, *could not* have reflected the actual results of the maintenance on the compressor at issue. ROA.5736–38 (deposition of Art Sepulveda).

Further, leaving aside the contrary testimony of appellants' experts, SASAI's *own* evidence revealed that its technicians were not using equipment capable of such precise measurements; the only equipment SASAI had on hand was an analog, hand-held micrometer. *See* ECF 141-1, App. 625–36 (SASAI Work Instruction 8.2.4-28).

15

Even if SASAI *had* used that device to attempt to measure its conformance (and there is no direct evidence in the record that SASAI actually measured its work), appellants' expert testified that the contract required at least a micrometer with a *digital* read-out. ROA.4907–08 (deposition of Donald E. Sommer); and SASAI's own Director of Quality Assurance testified under oath as to the imprecision of a micrometer at the requisite degree of specificity:

> Q.    They don't do the measurement of the case landing machining diameters with a micrometer, do they?

> A.    Not that I know of, no. It's not – the CMM [Coordinated Measuring Machine] is a lot more accurate than a human using a micrometer.

> …

> Q.    If one of the technicians who performed the measurements of the com – inner diameter of the compressor lands used a micrometer with extension, would that be an improper method? [Objection]

> A.    Typically, that's not done because we always use CMM.

ROA.4928–29 (deposition of Joseph Stanley Suszczynski).

In other words, the most that can be said of the evidence in favor of SASAI's measurement of its work is that, *if* SASAI measured it (for which there is no direct evidence), it would have used a tool that was likely

incapable of providing the requisite precision—and certainly not to the thousandth of an inch. Whether SASAI did not measure at all, or measured using an imprecise tool, the upshot is the same: the only measurements SASAI released to the government did not conform to the relevant contract specifications—because they were not the *actual* measurements of the blade land diameters in the overhauled compressor after the completion of SASAI's contractually required maintenance.

Beyond its failure to measure the blade land diameters, SASAI more generally failed to conform to the contract specifications that it conduct operational testing of the compressor to further ensure that its maintenance was performed correctly. Section 1.4.3 of the Performance Work Statement ("PWS") required that, for final acceptance under the contract, SASAI must "deliver all maintained/repaired engines and MISTR[6] components in a tested, serviceable and Ready For Installation (RFI) condition." ROA.5321 (quoting PWS ¶ 1.4.3). The same PWS section further required that SASAI maintain performance data and test logs from its testing. ROA.5321 (quoting PWS ¶ 1.4.3). SASAI never came

---

6. MISTR is an acronym for Management of Items Subject to Repair, which is defined as items that have failed in the field and that are sent to the depot for repair.

17

forward with any evidence to show that the compressor was tested in accordance with the PWS—let alone with data arising from such testing.

Despite the multiple instances of non-conformance to the overhaul specifications, SASAI executed a Certificate of Conformance to the government when it delivered the compressor. SASAI's Certificate of Conformance, dated June 21, 2016, stated that,

> THE SUPPLIES OR SERVICES CALLED FOR BY CONTRACT NO. KAC11062014 ARE IN ACCORDANCE WITH KAC PRIME CONTRACT NO. FA8124-15-D-0002 AND ALL APPLICABLE REQUIREMENTS. I FURTHER CERTIFY THAT THE SUPPLIES OR SERVICES ARE OF THE QUALITY SPECIFIED AND CONFORM IN ALL RESPECTS WITH THE CONTRACT REQUIREMENTS.

ECF 112-1, App. 390. Appellants adduced substantial evidence in the district court that this certification was false.

### 3. The Government Re-Took Possession of the Compressor Without Inspecting or Testing for Conformance

When it re-took possession of the compressor, the Air Force did not inspect or re-measure the inner diameter of the compressor case— because it was delivered fully assembled. Satisfaction of the contract specifications, including WP 138, WP 150, and WP 158, could not be assessed without physically disassembling the compressor. ROA.4452 (declaration of Donald Sommer, ¶ 11) ("[S]ince any acceptance of the

18

compressor by the military occurred when the compressor was assembled, the military could not ascertain whether the inner diameter blade track lands actually met specifications.").[7]

SASAI argued in the district court that the government was aware of any defects in its maintenance because it supervised and audited SASAI's maintenance operation. However, under oath, its own witnesses testified that the government did not witness or supervise *any* of the work performed on the subject compressor. ROA.4953 (deposition of Jose Danny Gonzales, pg. 54, ll.10–25).

SASAI nevertheless attempted to establish that the government inspected its work by introducing emails that were presented via an affiant who lacked personal knowledge of their contents. But even if that evidence was properly before the district court, *but see post* at 46–49 (arguing that it should have been excluded), the first email relates only to *paperwork* acceptance, ECF 112-1, App. 383 (email from Ernest

---

7. The Air Force conducted a single test of the engine—what is known as an "isochronal run." SASAI claimed that some results of the isochronal run showed deficiencies. However, the deficiencies addressed propeller governing and had nothing to do with compressor operation. The isochronal run lasts mere minutes and would not disclose any non-conforming measurements or non-axisymmetric rotor installation, the symptoms of which manifest and accelerate only with (and after) extended use. ROA.4452–53 (declaration of Donald Sommer, ¶ 12).

19

Valdez), and the other two emails cryptically note only that "DCMA inspected," without providing any specifics about what that inspection entailed. ECF 112-1, App. 416, 425 (emails from Jesus Granados). SASAI's own officer testified that a DCMA "inspection" consists of a document review and a visual inspection of the fully assembled compressor by DCMA personnel who lack expertise in engine overhaul—and who, in any event, did not take the compressor apart. ROA.4958–59 (deposition of Ronald Zigmond).

**4. SASAI's Negligent and Non-Conforming Maintenance Proximately Caused the Crash**

On February 8, 2017, Puerto Rico Air National Guard personnel installed the compressor into a T56 engine, before installing that specific engine onto the accident aircraft on July 14, 2017. Between the installation of the engine and the accident, the aircraft was flown on only eight flights, totaling 35.4 hours of flight time. However, in order to conform to government specifications, the compressor was required to operate a minimum of 200 flight hours without failure—which it undisputedly did not do. ROA.3248 (report of William D. Carden).

Further, data recovered after the accident from the aircraft's Digital Flight Data Recorder (DFDR) confirmed that the number-one

engine experienced a progressive decay in performance over the course of the last five flights—culminating in significant RPM fluctuations (and a loss of power from the number-one engine) on the accident flight itself. ROA 4473–80 (report of Donald E. Sommer); 4777–90 (report of Zoltán Spakovszky).[8] As Dr. Spakovszky concluded:

> During flights after overhaul, the blade tip-clearances progressively deteriorated due to a tip-clearance induced whirl instability (a self-excited vibration) caused by improper overhaul, leading to rubs between the rotor blade tips and the aluminum coated casing.
> . . . .
> The progressively enlarged blade tip clearances more likely than not led to a progressive deterioration of compressor performance and stability, reducing pressure ratio, efficiency and surge margin.

ROA.4790.

Appellants' experts thus provided substantial evidence that SASAI's negligent maintenance proximately caused the crash. The excessive blade tip clearances induced by SASAI's faulty blade land machining and the non-axisymmetric case assembly caused an aerodynamically induced "rotor whirl instability" in the compressor,

---

8. The issues with the number-one engine were sufficiently significant that, on the flight immediately preceding the accident flight (described in the district court as the "ferry flight"), the flight crew reported an RPM issue with the engine and flagged it for troubleshooting and repair. ROA.2818 (citing ECF 112-1, App. 315–18).

21

which detrimentally affected compressor operation, leading to the crash. ROA.4783–91 (Spakovszky report); 4746 (Sommer report). Specifically, the deteriorated compressor performance led the fuel control to fight the mechanical propeller governing system, resulting in rotor shaft RPM oscillations that ultimately led to the failure of the number-one engine, the aircraft's departure from controlled flight, and, ultimately, the crash. ROA.4483 (Sommer report); 4786–90 (Spakovszky report).

## B.  Procedural Background

Appellants brought the instant suit for wrongful death and survivorship against SASAI and Standard Aero Redesign Services, Inc. ("SARSI") in Texas state court—alleging, as relevant here, that SASAI's negligent maintenance of the compressor module on the number-one engine was a proximate cause of the accident. ROA.67–80 (complaint). SASAI and SARSI removed the case to the U.S. District Court for the Western District of Texas, where it proceeded to discovery.[9]

Concurrent with its summary judgment motion, SASAI filed several motions to preclude expert opinions under FED. R. EVID. 702 and

---

9. Appellants are not appealing the district court's grant of summary judgment in favor of SARSI.

22

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Specifically, SASAI challenged appellants' experts' post-crash measurements of the compressor; their opinions concerning the aerodynamic rotor whirl instability caused by SASAI's negligent maintenance; and their opinions that SASAI's negligent maintenance caused the airplane to crash. ROA.1726, 1887, 1993, 2295, 2721, 3743. After holding two hearings on the motions to preclude, Judge Farrer (the magistrate judge to whom Judge Ezra referred the motions) denied them. ROA.5604 (order). SASAI did not seek further review of those denials.

The district court nevertheless granted SASAI's motion for summary judgment—entirely on the ground that, in its view, the military contractor defense first articulated by the Supreme Court in *Boyle* preempted appellants' state-law negligence claims. ROA.5796–803 (district court op. at 22–29). The district court based its ruling on its interpretation of *Boyle* and *Hudgens* v. *Bell Helicopters/Textron*, 328 F.3d 1329, 1335 (11th Cir. 2003). In that latter case, the Eleventh Circuit explained why *Boyle* should apply not just to design-defect claims (as in *Boyle* itself), but to (some) negligent maintenance claims, as well—and it articulated a three-part test for when *Boyle* would provide a defense in

such cases, *i.e.*, if: "(1) the United States approved reasonably precise maintenance procedures; (2) [the contractor's] performance of maintenance conformed to those procedures; and (3) [the contractor] warned the United States about the dangers in reliance on the procedures that were known to [the contractor] but not to the United States." *Id.* at 1335.

The dispositive issue in this case is the second *Boyle* element, *i.e.*, conformance. Critically, the district court specifically did *not* discredit any of the evidence adduced by appellants to establish that SASAI's negligent maintenance did not conform to the relevant contract specifications; it simply concluded that appellants' evidence was displaced by what it decided was SASAI's evidence of acceptance and extensive use of the compressor by the government. ROA.5796 (district court op. at 22) ("While there are competing experts on this issue[,] for the reasons stated below, Defendants provide an alternative justification to establish conformance to the Government's maintenance procedures, which is dispositive.").[10]

---

10. Because the district court did not discredit appellants' evidence and instead rested its ruling on a legal conclusion, this Court is required to draw all factual inferences in favor of appellants. *See, e.g.*, *Reingold*, 126 F.3d at 646.

24

That "alternative justification" was SASAI's argument that the evidence it adduced established that the government accepted the compressor after inspection and extensively used it in service. Relying on design-defect cases from this Court and elsewhere, the district court started with the observation that "[e]xtensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, constitutes evidence that the product line generally conformed with the government-approved specifications." ROA.5796 (district court op. at 22).

From that principle, Judge Ezra extrapolated two conclusions: First, that the same is true for a negligent maintenance claim; and second, that such evidence is not just probative, but *conclusive*, even in the face of substantial direct evidence of non-conformance. As Judge Ezra concluded, "[t]he Court finds the evidence sufficiently establishes that the Compressor was not only inspected, accepted and used by the Government, but also that there was extensive government involvement in the review, development and testing of SASAI's maintenance overhaul." ROA.5800 (district court op. at 26).

25

The district court also rejected appellants' argument that the government's acceptance and use does not prove conformance if the government did not *know* that it had accepted a non-conforming component. ROA.5801–03 (district court op. at 27–29). Judge Ezra concluded instead that SASAI "provide[d] enough evidence to show the Government was engaged in monitoring the overhaul of the Compressor," ROA.5802 (district court op. at 28), such that it had necessarily ratified SASAI's work before retaking possession. ROA.5803 (district court op. at 29). Thus, it concluded that *Boyle* foreclosed appellants' claims.

Finally, although SASAI's motion for summary judgment had argued in the alternative that "SASAI's alleged conduct did not—and could not—proximately cause the Accident," the district court declined to reach that argument, "[b]ecause the Court has already determined the government contractor defense applies." ROA.5806 (district court op. at 32). In other words, the district court's grant of summary judgment was based solely on its conclusion that, even if SASAI's maintenance had been negligent, and even if that negligence had caused the accident, *Boyle* foreclosed any relief under state tort law.

This timely appeal followed. *See ante* at 1 & n.1.

26

## SUMMARY OF ARGUMENT

This central question this appeal raises is what a government maintenance subcontractor must demonstrate with respect to its conformance to contract specifications in order to trigger *Boyle*'s immunity defense, especially at the summary judgment stage. The district court erred when it granted SASAI's motion for summary judgment on the ground that the government possessed and (briefly) used the overhauled compressor, and that its "acceptance" and use of the compressor conclusively established SASAI's conformance. That holding was predicated on three critical errors, each of which warrants reversal.

First, the district court wrongly treated the government's possession and use as *conclusive* evidence of conformance. As this Court (and other courts) have long made clear under *Boyle*, the government's acceptance and use of a component can be *probative* as to the contractor's conformance, but it can also be overcome by *direct* evidence of non-conformance. Second, the district court failed to account for the voluminous, direct evidence appellants adduced of SASAI's non-conformance to multiple different contract specifications. At the very least, that evidence gives rise to a genuine issue of material fact as to

*whether* SASAI conformed to the relevant contract specifications—which should have precluded summary judgment in SASAI's favor below.

Third, because appellants have adduced substantial direct evidence of non-conformance, the only ground on which *Boyle* could still successfully be invoked is if the government *knowingly* accepted a non-conforming component. Here, though, there is no evidence in the record that the government re-took possession of the compressor with knowledge of its non-conformance—and there is significant evidence to the contrary. The government did not disassemble the compressor when it re-took possession. It did not otherwise inspect the compressor to ensure compliance with the contract specifications at issue. And the best that can be said about the DCMA "audits" and "inspection" on which Judge Ezra relied is that the record clearly establishes that such processes did not detect—and would not have detected—the multiple respects in which SASAI's maintenance was, in fact, non-conforming.

The upshot is that appellants are suing SASAI for *its* alleged negligence, and not for anything the government "made" it do. To nevertheless apply *Boyle* to these facts is to turn not just the letter of that decision, but its animating purpose, entirely on its head.

28

## ARGUMENT

### I. STANDARD OF REVIEW

This Court "review[s] a district court's grant of summary judgment *de novo*, applying the same standard of review as would the district court." *Reingold*, 126 F.3d at 646. "On summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion," *i.e.*, the appellants. *Id.* When "a party seeks summary judgment pursuant to an affirmative defense, the movant must establish beyond peradventure the elements of the defense. Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Smith* v. *Regional Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016) (citation omitted).

### II. THE DISTRICT COURT WRONGLY HELD THAT THE GOVERNMENT'S "ACCEPTANCE" AND "USE" OF A COMPONENT CONCLUSIVELY ESTABLISHES CONFORMANCE UNDER BOYLE

As the Supreme Court has made clear, *Boyle* forecloses state tort liability only "[w]here the government has directed a contractor to do the very thing that is the subject of the claim." *Malesko*, 534 U.S. at 74 n.6. The second *Boyle* prong goes right to the heart of that principle—asking

29

whether the contractor is being sued for *departing* from reasonably precise contractual specifications or for *following* them. In the latter case, because the federal government is immune from tort liability under the FTCA, *Boyle* provides that the contractor will be, as well. In the former case, however, *Boyle* and its progeny are clear that no federal defense exists—and that state law will govern tort claims against the contractor.

Here, the district court held that appellants' claims fall on the *Boyle* side of the line—entirely because of the government's possession and use of the compressor after its overhaul by SASAI. In so holding, the district court both (1) misapplied case law from this Court and others; and (2) failed to credit appellants' substantial *direct* evidence of non-conformance. That evidence may not establish *appellants'* entitlement to summary judgment, but drawing all inferences in appellants' favor, as the district court should have (and as this Court must), it cuts decisively against the district court's grant of summary judgment to SASAI.

## A.  The Purpose of *Boyle* is to Prevent Holding Contractors Liable Only for Torts Caused by Their Adherence to Government Contracts

The government contractor defense stems from the immunity enjoyed by the United States from certain tort claims—those based upon

30

the performance of "discretionary functions," which are exempted from the FTCA, 28 U.S.C. § 2680(a). *See Bailey* v. *McDonnell Douglas Corp.*, 989 F.2d 794, 798 (5th Cir. 1993) (citing *Boyle*, 487 U.S. at 507). The government contractor defense exists to "prevent the contractor from being held liable when the government is actually at fault." *Mitchell* v. *Lone Star Ammunition, Inc.*, 913 F.2d 242, 245 (5th Cir. 1990) (citing *Trevino*, 865 F.2d at 1478). Indeed, "[i]t makes little sense to insulate the Government against financial liability for the [discretionary decision] that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." *Bailey*, 989 F.2d at 798 (citing *Boyle*, 487 U.S at 512).

This Court has never applied *Boyle* to a negligent maintenance case. But in three cases, it extended *Boyle* to manufacturing defect claims in ways that provide guidance here. First, in *McGonigal* v. *Gearhart Industries, Inc.*, 851 F.2d 774 (5th Cir. 1988), this Court evaluated *Boyle* in the context of a claim of negligence in the manufacture of a grenade. Specifically, the defendant was found to have negligently performed x-ray inspections of grenades it manufactured for the military, and permitted a grenade with a defective fuse to be delivered to the military.

31

*Id.* at 777. This Court held that *Boyle* did not apply because the defendant "was not performing in compliance with government specifications." *Id.*

Following the holding in *McGonigal*, this Court in *Mitchell* declined to apply the government contractor defense in a case involving negligent manufacture of a mortar shell:

> In this case, the plaintiffs based their claim on alleged manufacturing defects: cracks in the projectile body of the mortar shell and voids in the shell's explosive filler. Plaintiffs maintained that the shell in question was dangerously defective, and did not conform to government specifications. The jury agreed, finding factually that the mortar shell did not conform to government design specifications. Under the law of this Circuit, the government contractor defense does not apply unless the contractor's product conforms to government specifications. A borrowed shield of sovereign immunity cannot protect a government contractor from liability for manufacturing defects.

*Mitchell*, 913 F.2d at 246.

And in *Bailey*, this Court explained both why *Boyle* extends beyond design-defect claims and why its extension is nevertheless limited:

> In sum, the government contractor defense does not necessarily apply only to claims labeled "design defect". Whether it will apply to a particular claim depends only upon whether *Boyle*'s three conditions are met with respect to the particular product feature upon which the claim is based. As stated by the Supreme Court, those conditions are designed to assure that the defense will apply only where the discretionary function policy behind it would be frustrated.

989 F.2d at 801–02 (footnote omitted). Ultimately, this Court reversed summary judgment on the defective manufacture claim because the defendant did not present any evidence that the product conformed to specification. *Id.* at 802.

This Court's series of opinions in *Mitchell, McGonigal*, and *Bailey* all reinforce that negligent manufacture cases do not implicate the second *Boyle* factor where the contractor creates the dangerous condition and fails to substantiate its burden of proving conformance. In such cases, the discretionary function policy behind the government contractor defense is not frustrated because the contractor is not being held responsible in lieu of the government; it is being held responsible for its own tortious conduct. Indeed, and importantly, neither SASAI nor the district court identified any case in which a contractor successfully invoked *Boyle* against a claim of negligent manufacturing or overhaul of a component that resulted in a defect that was *unknown* to the government.[11]

---

11. This Court has not yet expressly extended *Boyle* to the context of negligent maintenance claims. But there is no obvious reason not to do so when appropriate—for the reasons the Eleventh Circuit set forth in *Hudgens*, and which have been adopted by district courts within this circuit. *See Hudgens*, 328 F.3d at 1333–34; *Takacs* v. *Am. Eurocopter, L.L.C.*, 656 F. Supp. 2d 640, 646 n.2 (W.D. Tex. 2009).

33

In the other direction, the conformance prong of *Boyle* reflects the understanding that a contractor should not be liable under state tort law when the liability is for *following* the government's express or implied directives. Thus, a contractor that can prove that it did only what the government instructed it to do has satisfied the second prong; state tort liability must come from a *deviation* from the government's specifications, not conformance to them. *See, e.g., Bailey*, 989 F.2d at 800 n.13 ("[W]e interpret *Boyle*'s statement that the defense bars '[l]iability for design defects,' to mean liability for defects in the government specifications.").

**B.    Government Acceptance and Extensive Use of an Overhauled Component Provides Inferential—but Not Conclusive—Evidence of Conformance**

Following other courts, this Court has recognized circumstances in which a contractor can satisfy *Boyle*'s conformance prong based upon an inference that can arise from the government's acceptance and extensive use of the component at issue. As the Court explained in *Miller* v. *Diamond Shamrock Co.*, 275 F.3d 414 (5th Cir. 2001), "Acceptance and use of an item following its production *can* establish that the item conformed to its specifications." *Id*. at 420 (emphasis added).

34

The word "can" was no throwaway in *Miller*; the cases cited in the same paragraph all reflected the same understanding—that government acceptance and use is *suggestive* of conformance, but not necessarily conclusive. The question in each case was whether the plaintiff had introduced any evidence tending to overcome the implication of the government's acceptance and use. *See id.*

Thus, in *Smith* v. *Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989), this Court found the conformance prong of *Boyle* satisfied only "[i]n the *absence* of any evidence adduced by Smith tending to show that the [product] had a manufacturing defect, *and* in the light of the government's acceptance and extended use of the [product] and [a key witness's] testimony that all units were inspected and tested." *Id.* at 139 (emphases added). Acceptance and extended use were evidence of conformance, but it was just as important that the plaintiff failed to adduce direct evidence of *non*-conformance.

*Miller* and *Smith* are no outliers. *See, e.g.*, *Groton* v. *Warren Pumps, LLC*, No. 1:17-1110, 2023 WL 3848412, at *19 (M.D. Pa. June 6, 2023) (explaining that plaintiff failed to rebut government acceptance with any evidence of non-conformance); *Sewell* v. *Sewerage & Water Board of New*

35

*Orleans,* No. 15-3117, 2016 WL 7385701, at *4 (E.D. La. Dec. 20, 2016) (explaining that acceptance can prove conformance "in the absence of conflicting evidence"); *Martinez* v. *Sci. Apps. Int'l Corp.*, No. 1:10-CV-207, 2015 WL 11109381, at *19 (S.D. Tex. June 29, 2015) (explaining that the plaintiff had failed to rebut proof of acceptance and use); *Quiles* v. *Sikorsky Aircraft*, 84 F. Supp. 2d 154, 166–67 (D. Mass. 1999) (explaining that a finding of government conformance is rebuttable); *Hendrix* v. *Bell Helicopter Textron, Inc.*, 634 F. Supp. 1551, 1557 (N.D. Tex. 1986) (explaining government acceptance can be conclusive when the plaintiff does not present any proof of non-conformance).

The upshot of these cases was perhaps best captured by the Connecticut Supreme Court in *Miller* v. *United Techs. Corp.*, 660 A.2d 810 (Conn. 1995). As it explained:

> Although we acknowledge that initial acceptance by the United States government, in the form of a signed DD-250, is *some* evidence that the aircraft complied with specifications, such preliminary acceptance cannot foreclose the possibility that the aircraft, in fact, was nonconforming. Especially in a highly complex product such as a military aircraft, slight deviations from required specifications may pass an initial inspection unnoticed, only to become apparent later after further examination or, as alleged by the plaintiff in this case, after such deviations have resulted in the malfunction of the product.

36

*Id.* at 834. Indeed, to reflexively treat acceptance and use as conformance would be "contrary to the criteria set forth in *Boyle* requiring that, in order for the defense to apply, the government must have specific knowledge of the defect and must nonetheless have given either its explicit and implicit approval of the product." *Id.* (citing *Boyle*, 487 U.S. at 512–13). So too, here.

### C. The District Court Erred by Treating the Government's Acceptance and Use of the Compressor as Conclusive Evidence of Conformance

As all of these cases establish, a plaintiff can rebut a contractor's indirect evidence of conformance through the government's acceptance and extensive use with *direct* evidence of *non*-conformance. The district court, however, incorrectly discounted appellants' direct evidence that the maintenance of the compressor at issue in this case did not conform to the required specifications—and that the government had no idea it had taken possession of a non-conforming component.

In holding that the government's acceptance and use of the compressor in this case necessarily established SASAI's conformance to the relevant contract specifications, Judge Ezra relied upon the following "facts":

37

1.    "Through its Certificate of Conformance, dated June 21, 2016, it is uncontested that SASAI represented to USAF that it complied with all requirements of the contract and met all specifications." ROA.5798 (district court op. at 24).

2.    "[A]fter SASAI completed the work order it received from the USAF, the compressor was inspected by the [Defense Contract Management Agency], which provides contract administration services for the Department of Defense." ROA.5798 (internal quotation marks omitted) (district court op. at 24).

3.    "[I]n 2016 the DCMA performed approximately 24 to 28 process audits related to SASAI's work." ROA.5799 (district court op. at 25).

4.    "DCMA agents went to SASAI's facility and performed a final inspection of the work performed on the Compressor and accepted the sale of the Compressor." ROA.5799 (district court op. at 25).

5.    The Air Force "used the Compressor," including by running a series of tests to "break in" the engine and through subsequent deployment of the compressor "on at least eight flights totaling approximately 35 hours." ROA.5800 (district court op. at 26).

From this, the district court concluded that "it is undisputed that [the government] conducted an inspection of the Compressor," accepted the compressor, and used the compressor. Thus, the district court concluded, SASAI had satisfied the conformance prong. ROA.5801–03 (district court op. at 27–29). But whether it is fair to characterize those conclusions as "undisputed," *see post* at 48–50, they do not support the conclusion the

38

district court drew from them—entirely because they fail to account for appellants' substantial and direct evidence of SASAI's non-conformance.

Among other things, appellants' experts' forensic evaluations of the compressor case revealed that it had been machined in excess of the specification limits of WP 138. They also revealed that the compressor rotor had been installed in a non-axisymmetric manner in non-conformance with WP 150 and WP 158. Appellants elicited testimony from SASAI's own Director of Quality Assurance that, even *if* SASAI had attempted to verify its compliance with WP 138, the means by which it would have done so would have been unlikely to provide sufficiently precise results. And appellants likewise adduced evidence that SASAI never tested the compressor in the manner the contract required. *See ante* at 13–17.

Whether this direct evidence of non-conformance suffices to prove appellants' claims is ultimately for a jury to decide. For present purposes, the critical point is that it was, and should have been, more than enough evidence to overcome any presumption in favor of conformance arising from the mere facts that the government possessed and briefly used the compressor.

39

In any event, none of the district court's five points tend to prove SASAI's conformance to the relevant contract specifications. There was no government inspection that could have tested the compressor for compliance with the relevant contract specifications. When it re-took possession of the compressor module, when it reinstalled the module into a T56 engine, and when it installed the engine onto the accident aircraft, the government did not know that SASAI's maintenance had failed to conform to the relevant contractual specifications—specifically WP 138, WP 150, and WP 158. This is true for the simple and undisputed reason that the defective maintenance created a latent defect that would have been detectable only if the compressor module had been physically disassembled and re-measured—something that the record conclusively demonstrates the government did not do. ROA.4452 (declaration of Donald Sommer, ¶ 11).

Although the district court concluded that it is "undisputed" that "Government entities . . . conducted an inspection of the compressor" when the Air Force took possession of the module, ROA.5800 (district court op. at 26), that inspection was an external, visual one only—and as

such *could not* have identified any non-conformance with WP 138, WP 150, or WP 158.

Nor is the district court's discussion of maintenance audits and general supervision relevant—again, because the government did not supervise SASAI's overhaul of the specific compressor at issue. ROA.4953 (deposition of Jose Danny Gonzales, pg. 54, ll.10–13) ("Q. Now you're not telling us that at the time of this overhaul that anybody for the USAF was standing there watching the overhaul? A. No Sir."). Nor could the district court have found that the "inspection" DCMA performed detected the allegedly negligent maintenance. In fact, the record evidence establishes the opposite. One of SASAI's own managers testified that a DCMA "inspection" consists of a document review and a general visual inspection of the fully assembled compressor by personnel who lack expertise in engine overhaul. ROA.4958–59 (deposition of Ronald Zigmond). That might be an "inspection" in colloquial terms, but it certainly is not an inspection sufficient to demonstrate conformance.

Nor could the district court find that the tests the Air Force ran on the engine did detect (or could have detected) the allegedly negligent maintenance. The defect would become latent only as the engine was

used—as confirmed by the DFDR data, which, as noted above, revealed that the number-one engine experienced a progressive decay in performance over the course of the last five flights, data of which the government was unaware until after the accident. *See ante* at 19–20.

"When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion. A rubber stamp is not a discretionary function; therefore, a rubber stamp is not 'approval' under *Boyle.*" *Trevino*, 865 F.2d at 1480; *see also Miller*, 660 A.2d at 778 ("If we were to conclude that the signing of a DD-250 constitutes government approval of any inherent defect as a matter of law, the signing of a DD-250 would foreclose any cause of action against a government contractor for latent defects regardless of whether the government was actually aware of the defects.").

The district court thus erred in holding that the government's acceptance and use of the compressor sufficed to establish SASAI's conformance to the relevant contract specifications. To the contrary, the record established that the government *demanded* conformance, that SASAI merely *represented* conformance, and that the government took

possession of and used a component it believed to be in conformance. After only 35 operational hours, that component failed—entirely because it did not, in fact, conform to specifications.

### D. The District Court Erred in Concluding that the Government's Use of the Compressor Was "Extensive"

Even if the government's acceptance and extended use of the compressor *could* conclusively establish SASAI's conformance to the relevant contract specifications, the district court also erred in treating the government's use in this case as "extensive."

This Court has held in the design defect context that "[e]xtensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications." *Kerstetter* v. *Pac. Sci. Co.*, 210 F.3d 431, 435–36 (5th Cir. 2000). That understanding makes especial sense in the context of design defect cases, which are predicated on the view that all of the relevant products reflect the same defect—and so the more extensively the product is used without issue, the stronger the evidence will be that it was built to specifications.

43

But "extensive" means exactly that—a long period of time, long enough for any defects to have become visible to (and knowingly accepted by) the government. In *Miller*, for instance, this Court addressed whether the government's extensive use of the herbicide Agent Orange in the Vietnam War served as evidence that the government was aware of a dangerous design feature alleged to have harmed the plaintiffs. The plaintiffs contended that Agent Orange did not conform to specification because it contained an ingredient the specifications did not expressly request. However, this Court reasoned that each shipment of Agent Orange was inspected and accepted by the government with the offending ingredient, and then used extensively throughout the (decade-long) duration of the war. Without direct evidence of non-conformance, that was enough. *Miller*, 275 F.3d at 420.

And in the *Ramstein Air Disaster* case, plaintiffs brought tort claims arising out of a 1990 air crash that, they claimed, was caused by the negligent reconfiguration of engine pylons on C-5A military aircraft— and by the specific kit that was adopted by the Air Force to effectuate that reconfiguration. As this Court explained,

> The defendants introduced evidence showing that the Air Force inspectors were present and actively involved

44

throughout the design, review, development and testing of the C-5A. Furthermore, the evidence[] showed that the Air Force accepted and has used the C-5A *for over 20 years without any significant problems*. From this evidence the district court could have concluded that the C-5A was built in accordance with Air Force specifications.

*In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570, 575 (5th Cir. 1996) (emphasis added). Evidence of the contractor's conformance did not come from a one-off acceptance of a single product in those cases; it came from a far wider (and chronologically longer) pattern of behavior and the government's knowledge of the dangerous condition.

Here, the non-conforming compressor was used for exactly 35.4 flight hours before it failed—*i.e.*, less than a day and a half. And by the fifth flight, the DFDR data demonstrates that the compressor was already beginning to fail. Even if the government's acceptance and extensive use of an overhauled component could ever conclusively establish that its maintenance conformed to specifications in the face of direct evidence to the contrary, the government's use in *this* case was by no means "extensive." There was, therefore, no basis for granting summary judgment to SASAI under *Boyle* based upon its "conformance" to the relevant contract specifications.

45

### III. THE GOVERNMENT HAD NO KNOWLEDGE THAT IT WAS ACCEPTING A NON-CONFORMING COMPONENT

Part II established why the government's acceptance and brief use of the compressor, by itself, did not support summary judgment on the ground that SASAI's maintenance had conformed to the relevant contract specifications under *Boyle*. But Judge Ezra's opinion can also be read to rest on a related but distinct conclusion—that the government exercised discretion to accept a non-conforming compressor. Insofar as the touchstone of *Boyle* is the government's discretion, its knowing acceptance of a non-conforming product would necessarily take the contractor off the hook for non-conformance, no matter how much evidence of that non-conformance appellants had introduced.

Here, though, there are two independent reasons why summary judgment should not have been granted to SASAI based upon this alternative theory. First, the evidence on which Judge Ezra relied should not have been admitted in the first place. And second, the evidence doesn't establish anything close to the conclusion that the government knowingly accepted, installed, and used a non-conforming compressor.

46

## A.    The District Court Should Have Excluded Evidence Arising from the Williams Declaration and the Beach Affidavit

In discussing the government's involvement in SASAI's maintenance procedures, Judge Ezra relied significantly on two sets of evidence: an affidavit from Kevin Beach, and a declaration from Tina Williams. Specifically, the district court relied upon two emails and two spreadsheets attached to the Williams Declaration and paragraphs 22–24 of the Beach Affidavit, all to find that "DCMA agents went to SASAI's facility and performed a final inspection of the work performed on the Compressor and accepted the Compressor." ROA.5799 (district court op. at 25). Further, even though this fact is *greatly* disputed, the district court also found that it "is undisputed that DCMA, KAC, and AECOM (Government entities) conducted an inspection of the Compressor." ROA.5800 (district court op. at 26). This finding was also based upon an email from a Lockheed engineer that was attached as an exhibit to the declaration of Tina Williams. *See* ROA.5798–800 (district court op. at 24–26) (citing these materials).

Appellants moved to exclude that evidence on the ground that, because Mr. Beach and Ms. Williams were precluded from testifying as

47

experts, their evidence should have been limited to what a lay witness could offer. Judge Ezra denied the motion, holding that "Defendants' evidence is capable of being admissible at trial through both lay and expert witnesses as well as those that can verify the documents referenced are SASAI's business records." ROA.5784 (district court op. at 10).

This holding was error. Nowhere in the record did SASAI or the court explain how the evidence relied upon by Ms. Williams in her declaration or by Mr. Beach in his affidavit would be made into an admissible form at trial—because it cannot be. As a mere recipient of the emails in question, Ms. Williams could never competently testify at trial as to the substance of the e-mails, *i.e.*, that the DCMA inspected the compressor, because she has no personal knowledge that an inspection took place, and the information in the emails and spreadsheets came from individuals outside of SASAI's employment. Further, as SASAI did not disclose any witness who *has* the requisite knowledge of any inspection, SASAI has no possible way to make the evidence it seeks to introduce admissible at trial—a showing the district court should have required SASAI to make, but didn't.

48

As to Mr. Beach, his deposition testimony makes clear that he had no recollection of this particular overhaul. ECF 112-1, App. 17. Further, Mr. Beach had no recollection of interfacing personally with anyone from DCMA with regard to the Bridge Contract, *id.*; he had no recollection of specific events regarding interactions in 2016 with DCMA, *id.*; there were other contractors DCMA visited in San Antonio during the period of the bridge contract, *id.* at 18; DCMA did not touch any product or do any work themselves, *id.* at 20; DCMA did not do laboratory testing or hold blueprints, *id.*; and Mr. Beach does not know if DCMA reviewed technical orders or made suggestions or changes. *Id.* The evidence the district court derived from Mr. Beach's affidavit thus reflected matters on which he had no direct, personal knowledge—and should therefore have been excluded for purposes of summary judgment. *See* FED. R. CIV. P. 56(c)(4).

Likewise, with respect to the Williams Declaration, Ms. Williams was a mere recipient of the emails and spreadsheets at issue, and cannot verify either the nature or accuracy of their content. Also, while the "outer hearsay" of email may be admissible under the business records exception, the "inner hearsay" of information provided therein by an outsider to the business preparing the record must also fall under a

49

hearsay exception to be admissible. *See, e.g., In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2012 WL 85447, at *4 (E.D. La. Jan. 11, 2012). Here, even if the "outer hearsay" of the emails to Ms. Williams were admissible under the business records exception, SASAI did not offer, and the district court did not identify, a basis for admitting the "inner hearsay" within those materials. For these reasons, appellants' motion to exclude should have been granted—and this evidence should not have been part of the summary judgment record in the district court.

## B. The Wrongly Included Evidence Does Not Establish the Government's Knowledge of Non-Conformance

In any event, even taking the evidence that should have been excluded at face value, those materials do not actually establish what the district court concluded they did, *i.e.*, that the government had any knowledge of SASAI's non-conformance to the underlying maintenance specifications. As noted above, the government never disassembled the compressor or conducted any other assessment or analysis of the component through which it could have detected the non-conformance. SASAI's own witness testified that a DCMA inspection consists only of a document review and a general visual inspection of the fully assembled

50

compressor by DCMA personnel who lack expertise in engine overhaul—and who, in any event, did not take the compressor apart. *See ante* at 17–19.

Likewise, there is no evidence that the government was, or would have been, aware of SASAI's non-conformance when it installed the compressor onto a T56 engine, or when it installed the engine onto the accident aircraft. As noted above, the "isochronal run" the Air Force conducted to run-in the engine was not designed or intended to—and did not—detect any abnormalities in the compressor module. *See ante* at 18 n.7. Not counting the DFDR data of which the Air Force was not aware before the crash, the only indication that anything might be wrong with the number-one engine was the cabin crew's report on the ferry flight immediately preceding the accident flight. *See ante* at 20 & n.8. By the time its implications were properly understood, it was too late.

Ultimately, appellants adduced substantial evidence tending to establish that SASAI failed to overhaul the compressor to the required specifications. On this record, there is absolutely no evidence to support the conclusion that the government knowingly accepted the non-conforming aspects of the compressor. Rather, the opposite is true: SASAI

51

expressly represented to the government that the compressor *met* the contract specifications, and that misrepresentation led directly to the government taking possession of the non-conforming compressor and incorporating it into service.

### C.    Applying *Boyle* to These Facts Would Invert the Principle for Which That Case Stands

Judge Ezra's flawed analysis would not just let SASAI off the hook in this case; if adopted by this Court, it could very well let every maintenance contractor off the hook going forward. After all, if the government's mere taking possession of an overhauled component and placing it into service immunizes the maintenance contractor from any latent faults resulting from its maintenance, then any resulting harm would produce no legal consequences. That is, quite pointedly, not the purpose of the defense *Boyle* recognized.

The district court's ruling is not just not *required* by *Boyle*; it is flatly inconsistent with it. If affirmed, it will inevitably create pressure on the government to change how it oversees maintenance contracts. After all, if the government's mere possession and brief use of an overhauled component necessarily demonstrates that the maintenance conformed to specifications, the government would have significant

52

incentives to adjust its behavior *prior* to accepting and using components maintained by government contractors going forward.

One of those incentives, of course, would stem from a desire to prevent accidents like the one in this case. But more generally, the government has a clear interest in ensuring that conformance to its specifications is meaningfully enforceable—including *by* the United States. In this case, that issue has arisen through a tort suit. But it is just as possible that non-conformance could be a central issue in *contract*-based litigation in which the federal government is the plaintiff. If the government's behavior in this case is enough to establish a contractor's conformance under *Boyle*, one can only assume that contractors will make similar arguments in those contexts, as well.

Either way, a rule under which a contractor's conformance to specifications is satisfied on these facts would necessarily incentivize the government to (1) more closely supervise any contractually outsourced maintenance; (2) fully inspect every component subject to such maintenance before retaking possession, including, where necessary, through disassembly; or (3) given the costs of either or both of these steps, provide all of that maintenance itself.

53

In other words, the district court's interpretation and application of *Boyle*'s conformance standard, if affirmed, would likely create additional costs for how the government chooses to exercise its discretion with respect to a wide swathe of maintenance contracts going forward.

That result would turn *Boyle* on its head. As this Court has noted,

> The logic [of *Boyle*] is that because a contractor will pass any added costs from litigation risk exposure to the government, "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production."

*Zeringue* v. *Crane Co.*, 846 F.3d 785, 790 (5th Cir. 2017) (quoting *Boyle*, 487 U.S. at 512) (second alteration in original), *overruled on other grounds by Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc).

Here, in contrast, the district court's decision, if affirmed, would necessarily *increase* either (1) the costs the government imposes upon contractors with respect to future maintenance contracts; or (2) the costs the government will choose to bear itself. Neither *Boyle* nor any decision of this Court requires such a counterintuitive result—and common sense augurs conclusively against it.

54

\* \* \*

The district court's cursory application of *Boyle* to grant summary judgment to SASAI on the current record cannot be reconciled with either *Boyle* itself or this Court's case law applying it. If appellants' evidence that SASAI's maintenance failed to conform to the relevant contract specifications holds up at trial, then this is the exact case that Justice Scalia went out of his way to distinguish in *Boyle*—one in which "[t]he contractor could comply with both its contractual obligations and the state-prescribed duty of care." 487 U.S. at 509.

Ultimately, appellants are not seeking to impose liability on SASAI for simply "perform[ing] as the Government directed." *Campbell-Ewald* v. *Gomez*, 577 U.S. 153, 167 (2016) (quoting *Yearsley* v. *W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940)). Their entire lawsuit is predicated on the argument (and, after discovery, the substantial evidence) that SASAI's maintenance did *not* conform to WP 138, WP 150, and WP 158, and that SASAI did not properly measure or test the results of its maintenance, either. If *Boyle* forecloses liability even in those circumstances, then it sweeps far more broadly than any court has ever previously suggested— and far more broadly than it should.

55

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment to SASAI should be reversed, and the case should be remanded to the district court for further proceedings.

Respectfully submitted,

/s/ Stephen I. Vladeck

Stephen I. Vladeck
600 New Jersey Avenue, N.W.
Washington, DC  20001
(202) 662-9313
svladeck@gmail.com

Donald J. Nolan
Thomas P. Routh
Thomas J. Ellis
NOLAN LAW GROUP
20 North Clark Street
30th Floor
Chicago, IL  60602

Bradley Stoll
KATZMAN, LAMPERT, & STOLL
121 North Wayne Avenue
Suite 205
Wayne, PA  19087

*Counsel for Plaintiffs-Appellants*

56

## CERTIFICATE OF SERVICE

I hereby certify that, on December 15, 2025, I electronically transmitted the attached Brief for Plaintiffs-Appellants to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF System, which sent a Notice of Electronic Filing to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

/s/ Stephen I. Vladeck

Stephen I. Vladeck
Counsel for Plaintiffs-Appellants

---

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 10,690 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font for text, and Century Schoolbook 12-point font for footnotes.

/s/ Stephen I. Vladeck

Stephen I. Vladeck
Counsel for Plaintiffs-Appellants