

# GEORGETOWN LAW

**Stephen I. Vladeck**
*Agnes Williams Sesquicentennial Professor of Federal Courts*

April 22, 2026

Lyle Cayce
Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130

 <u>Re</u>:  *Gonzalez Maldonado* **v.** *Standard Aero (San Antonio), Inc.***, No. 25-50770**

Dear Mr. Cayce,

 I represent the plaintiffs-appellants in the above-captioned case, which is scheduled for oral argument on June 1, 2026. I write pursuant to Fed. R. App. P. 28(j) to apprise the Court of the Supreme Court's ruling in *Hencely* v. *Fluor Corp.*, No. 24-924 (U.S. Apr. 22, 2026), a copy of which is attached to this letter.

 Among other things, *Hencely* concerned whether the federal common law government contractor defense that the Supreme Court recognized in *Boyle* v. *United Technologies Corp.*, 487 U.S. 500 (1988), applied to displace state tort claims against a government contractor by the victims of a suicide bombing carried out by the contractor's employee. For a 6-3 majority, Justice Thomas held that the answer is "no."

 In the process, the *Hencely* Court reaffirmed several propositions advanced in plaintiffs-appellants' opening and reply briefs—that the Supreme Court "has emphasized the narrowness of [the *Boyle*] doctrine," slip op. at 6; that *Boyle* does not apply when a plaintiff challenges "conduct that . . . was not authorized by, but was even contrary to, federal instructions," *id*. at 8; and that "in a case in which the Government asks a contractor for a certain result, and the contractor is sued for how it achieved that result, the suit is not preempted if the Government was silent about the conduct that allegedly violated state law." *Id*. at 9. Those conclusions may all reinforce the reasons plaintiffs-appellants have advanced for vacating the district court's grant of summary judgment to Standard Aero (San Antonio), Inc., and remanding for further proceedings.

 I would appreciate it if you could share this letter with the panel to which this case has been assigned.

Sincerely yours,

Stephen I. Vladeck

Georgetown University Law Center | 600 New Jersey Avenue, N.W. | Washington, DC 20001
E-Mail: stephen.vladeck@law.georgetown.edu | Telephone: (202) 662-9313

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HENCELY *v.* FLUOR CORP. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24–924. Argued November 3, 2025—Decided April 22, 2026

Military contractor Fluor Corporation hired Ahmad Nayeb to work at a U. S. base in Afghanistan as part of the "Afghan First" initiative, a military program that required contractors to hire Afghans to help stimulate the local economy and stabilize the Afghan Government. Nayeb, a Taliban operative, later carried out a suicide-bomb attack at the base that killed 5 and wounded 17. The Army's investigation found Fluor primarily responsible for the attack because it negligently supervised Nayeb in complying with base procedures. Former Army specialist Winston T. Hencely, who suffered a fractured skull and brain injuries in the course of stopping Nayeb before he could reach a larger crowd, sued Fluor in the United States District Court for the District of South Carolina seeking damages under South Carolina law for negligent supervision, negligent entrustment of tools, and negligent retention of Nayeb. The District Court entered summary judgment for Fluor, and the Fourth Circuit affirmed. It held that during wartime, state-law claims against military contractors under military command arising out of combatant activities are preempted. The Fourth Circuit reasoned that the Federal Tort Claims Act's combatant-activities exception, which preserves the Federal Government's immunity against claims "arising out of the combatant activities of the military" during wartime, 28 U. S. C. §2680(j), also reflects a congressional intent to bar tort suits against contractors connected with those combatant activities, even when the contractor is alleged to have violated its instructions from the military.

*Held*: The Fourth Circuit erred in finding Hencely's state-law tort claims preempted where the Federal Government neither ordered nor authorized Fluor's challenged conduct. Pp. 5–15.

(a) Neither the Constitution nor any federal statute expressly preempts Hencely's suit. The Supremacy Clause requires state law to yield only when it conflicts with rights or restrictions that stem from the Constitution or a valid federal statute or treaty. *Kansas* v. *Garcia*, 589 U. S. 191, 202. Here, no constitutional provision or federal statute expressly preempts Hencely's suit. And the Court has already held that the FTCA's combatant-activities exception does not itself apply to suits against federal contractors. See *United States* v. *Orleans*, 425 U. S. 807, 813–814. P. 5.

(b) Lacking any constitutional or statutory text supporting preemption, the Fourth Circuit relied on *Boyle* v. *United Technologies Corp.*, 487 U. S. 500. *Boyle* does not support the Fourth Circuit's preemption rule. *Boyle* involved a procurement contract, not a performance contract like the one here, and it did not involve the FTCA's combatant-activities exception. More importantly, *Boyle* recognized displacement of state law only when there is a "significant conflict" between state law and "an identifiable federal policy or interest." *Id.*, at 507 (internal quotation marks omitted). *Boyle* accordingly protects a contractor only when the Government directed the contractor to do the very thing challenged in the suit. *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 74, n. 6. Hencely, by contrast, sued Fluor for conduct that was not authorized by the military and was allegedly contrary to federal instructions. *Boyle*'s reasoning thus contradicts the Fourth Circuit's analysis. Even assuming a "uniquely federal interest" in regulating military bases overseas, no "significant conflict" exists between that interest and state-law negligence liability based on a contractor's departure from military instructions. *Boyle*, 487 U. S., at 507. Pp. 5–11.

(c) The Fourth Circuit's preemption test sweeps too broadly. The FTCA's combatant-activities exception protects the Government's own combat-related decisions. Any comparable federal interest would therefore preempt state law only where the challenged conduct can fairly be treated as the military's *own* conduct or decision. But the Fourth Circuit expressly concluded that resolving Hencely's claims would not require evaluating the reasonableness of military judgments, and it nonetheless found preemption simply because the suit arose in a wartime combat setting. *Boyle*'s rationale justifies no such blanket preemption. Pp. 11-12.

(d) Nor does the Constitution's structure implicitly bar this suit. Although the Constitution gives Congress and the President broad war powers, that assignment has never been understood to bar all war-related tort suits. And federal contractors do not automatically share the Government's immunity merely because they perform services for it. Absent a statute to the contrary, States can regulate or tax federal contractors on the same terms as any private company. See, *e.g.*,

Syllabus

*James Stewart & Co.* v. *Sadrakula*, 309 U. S. 94, 104.  Fluor does not attempt to, and could not, invoke a defense under *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18. The *Yearsley* doctrine shields a contractor only when it is being sued precisely for accomplishing what the Federal Government requested.  Because Fluor is alleged to have acted outside the authority the military granted it, *Yearsley* does not apply. Pp. 12–16.

120 F. 4th 412, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which SOTOMAYOR, KAGAN, GORSUCH, BARRETT, and JACKSON, JJ., joined.  ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and KAVANAUGH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

––––––––––

## No. 24–924

––––––––––

## WINSTON TYLER HENCELY, PETITIONER *v.* FLUOR CORPORATION, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[April 22, 2026]

JUSTICE THOMAS delivered the opinion of the Court.

In 2016, a Taliban operative working for respondent Fluor Corporation, a military contractor, carried out a suicide-bomb attack at Bagram Airfield in Afghanistan. After then-Army Specialist Winston T. Hencely confronted him, the bomber detonated his suicide vest. As a result of the injuries he received, Hencely is now permanently disabled. In an effort to recover damages for his injuries, Hencely sued Fluor, bringing state-law tort claims for negligently retaining and supervising the attacker. According to Hencely and the United States military, Fluor's conduct was not authorized by the military and even violated instructions the military had given it as a condition of operating on the base.

Fluor argues that federal law preempts Hencely's suit. But, no statute or constitutional provision expressly does so. And, our precedent suggests that state law is generally not preempted when the "contractor could comply with both its contractual obligations" to the military and state law— unlike when the state-imposed duty "is precisely contrary to the duty imposed by the Government contract." *Boyle* v.

*United Technologies Corp.*, 487 U. S. 500, 509 (1988). However, the United States Court of Appeals for the Fourth Circuit held that federal law preempts Hencely's suit based on a different rule: During wartime, all state-law claims against military contractors under military command arising out of combatant activities are preempted regardless of whether any conflict exists between the military's instructions and state law. 120 F. 4th 412, 426 (2024). We disagree. The preemption rule on which the Fourth Circuit relied lacks any foundation in the Constitution, federal statutes, or our precedents.

<h2 style="text-align:center">I</h2>
<h2 style="text-align:center">A</h2>

Hencely, a former Army specialist, was seriously injured in a Taliban suicide attack on Veteran's Day 2016 at Bagram Airfield, then the largest U. S. base in Afghanistan. Hencely saw the perpetrator, Taliban operative Ahmad Nayeb, as Nayeb was walking toward a Veteran's Day 5K race. When Hencely attempted to question him, Nayeb detonated his suicide vest. The explosion killed 5 and wounded 17. Hencely, then just 20 years old, suffered a fractured skull and brain injuries. The Army concluded that Hencely's intervention "likely prevent[ed] a far greater tragedy." App. to Pet. for Cert. 156.

Nayeb worked as a "Local National" contractor at Bagram as part of the military's "Afghan First" program. 120 F. 4th, at 418. That program sought to stimulate the local economy and stabilize the Afghan Government by requiring contractors to hire Afghans "'to the maximum extent possible.'" *Ibid.* The military interviewed and screened potential employees. During this process, it learned that Nayeb had been involved with the Taliban in the past. Nonetheless, it approved him for employment.

After this approval, Fluor's subcontractor hired Nayeb to work in the base's nontactical vehicle yard. The Army's

contract with Fluor made it "'responsible for oversight of [its] personnel or Subcontractors to ensure compliance with all terms of the'" contract. *Id.*, at 419. Fluor was also required to comply with base-security policies. Under the "Bagram Airfield Badge, Screening, and Access Policy," all nonuniformed personnel, including Nayeb, were assigned a color-coded badge. *Ibid.* The policy required that Fluor escort red-badge holders like Nayeb in all areas of the base except at their work sites and maintain "'constant view' of them." *Id.*, at 419–420.

The Army's investigation found Fluor primarily responsible for the attack. Interviews of Fluor personnel "reveal[ed] a poor understanding by Fluor supervisors as to who was responsible for Nayeb's supervision" and "an unreasonable complacency by Fluor to ensure Local National employees were properly supervised at all times, as required by their contract." App. to Pet. for Cert. 171. The Army also concluded that Fluor failed to impose adequate disciplinary measures on Nayeb, who slept on the job and was absent from his work area without justification, even though these were grounds for firing him. Fluor's lax supervision, the Army's report continued, allowed Nayeb to check out tools that he did not need for his job and that he used to make the bomb inside Bagram. And, Fluor "was . . . deficient in [its] performance of executing and supervising escort duties" when employees like Nayeb left their work stations to leave the base. *Id.,* at 174. Instead of escorting Nayeb to the base exit at the end of his shift, Fluor relied on a sign-out system administered by another Afghan employee, in violation of the base's badge policies. The report found that this lax supervision "enabled Nayeb to go undetected" for nearly an hour on the day of the attack and to walk at liberty throughout the base until Hencely confronted him. *Id.*, at 176. In sum, the report concluded that "the primary contributing factor" to the attack was "Fluor's

complacency and its lack of reasonable supervision of its personnel." *Id.*, at 158.

B

Hencely sued Fluor and its subsidiaries in the United States District Court for the District of South Carolina, where two Fluor subsidiaries are located. Hencely brought claims under South Carolina law for negligent supervision, negligent entrustment of tools, and negligent retention of an employee. Following Circuit precedent, the District Court entered summary judgment for Fluor. 554 F. Supp. 3d 770, 774 (2021). Under that precedent, suits against military contractors arising out of combatant activities are generally preempted. See *In re KBR, Inc., Burn Pit Litigation*, 744 F. 3d 326, 349, 351 (CA4 2014).

The Fourth Circuit affirmed under this "battlefield preemption" doctrine. 120 F. 4th, at 418, 430. According to the Fourth Circuit, "'[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.'" *In re KBR*, 744 F. 3d, at 349 (quoting *Saleh* v. *Titan Corp.*, 580 F. 3d 1, 9 (CADC 2009)). The court reasoned that the Federal Tort Claims Act's combatant-activities exception, which preserves the Federal Government's immunity against claims "arising out of the combatant activities of the military" during wartime, 28 U. S. C. §2680(j), also reflects a congressional intent to bar all tort suits against contractors connected with those combatant activities. On the Fourth Circuit's view, state-law tort suits cannot proceed even when the contractor is alleged to have violated its instructions from the military.

We granted Hencely's petition for a writ of certiorari to decide whether a state-law suit premised on a military contractor's activities in a war zone is preempted even when

the contractor was not required or authorized to take the action at issue. 605 U. S. 968 (2025).

## II

Neither the Constitution nor any federal statute supports the Fourth Circuit's broad rule. Nor does the Court's opinion in *Boyle* support preemption in this case.

## A

The Supremacy Clause provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2. "[W]hen a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." *Martin* v. *United States*, 605 U. S. 395, 409 (2025). But, "[t]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Petroleum Corp.*, 485 U. S. 495, 503 (1988). Instead, "the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas* v. *Garcia*, 589 U. S. 191, 202 (2020).

Fluor has not identified any provision of law expressly preempting Hencely's suit. No constitutional provision says it is preempted, and neither the Fourth Circuit nor Fluor suggests otherwise. Nor does any federal statute preempt this suit. Fluor cites only the FTCA's combatant-activities exception, §2680(j), which, this Court has explained, does *not* apply to suits against federal contractors, see *United States* v. *Orleans*, 425 U. S. 807, 813–814 (1976) (citing §2671); accord, *post*, at 15 (ALITO, J., dissenting).

## B

Without any constitutional or statutory text expressly supporting preemption, the Fourth Circuit, like the D. C.

Circuit before it, resorted to our precedent in *Boyle.* 120 F. 4th, at 425–426; see also *Saleh*, 580 F. 3d, at 5. According to the Fourth Circuit, *Boyle* requires preemption of all claims against contractors engaged in combatant activities under the military's command authority. 120 F. 4th, at 425–426. For its part, the Government asserts that an action is preempted if it "arises from both combatant activities and a contractor's actions within the scope of its contract." Brief for United States as *Amicus Curiae* 28. Our precedents do not support either rule.

To start, *Boyle* does not squarely govern. It concerned the performance of a procurement contract, not a performance contract, and the combatant-activities exception was not at issue. Accord, *post*, at 16–17 (opinion of ALITO, J.). But, regardless, its reasoning does not support the Fourth Circuit's preemption rule.

Under our precedents, *Boyle* explained, "a few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law," fashioned by federal courts in the absence of congressional action. 487 U. S., at 504 (quoting *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 640 (1981); citation omitted); see, *e.g.*, *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 366–367 (1943); *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 726–729 (1979). In those rare areas of "uniquely federal interest," the Court has held state law preempted when there is a "significant conflict" between "an identifiable federal policy or interest and the [operation] of state law," or when "specific objectives" of federal legislation would be frustrated. *Boyle*, 487 U. S., at 505, 507 (internal quotation marks omitted). This Court has emphasized the narrowness of this doctrine, which will rarely apply when "litigation is purely between private parties and does not touch the rights and duties of the United States." *Bank of America Nat. Trust & Sav.*

*Assn.* v. *Parnell*, 352 U. S. 29, 33 (1956); see *Boyle*, 487 U. S., at 506.

In *Boyle*, the conflict between federal interests and state law was particularly sharp. There, a Marine helicopter pilot drowned after a crash during a training exercise. *Id.,* at 502. The pilot's father sued the manufacturer of the helicopter, alleging that, under state tort principles, the escape hatch for the helicopter should have opened *inward* even though the federal procurement contract for the helicopter required that it open *outward*. *Id.*, at 503.

To assess preemption of that suit, the Court first identified a "'uniquely federal' interest" in the "the civil liabilities arising out of the performance of federal procurement contracts." *Id.*, at 505–506. After all, the Court reasoned, in *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18 (1940), the Court had rejected "an attempt by a landowner to hold a construction contractor liable under state law" for eroding land in the course of constructing dikes for the Government. *Boyle*, 487 U. S., at 506 (citing *Yearsley*, 309 U. S., at 20–21). There was "no basis for a distinction," *Boyle* explained, between a contractor's fulfillment of a performance contract like the one in *Yearsley* and a contractor's faithful execution of a procurement contract for helicopters. 487 U. S., at 506.

*Boyle* was clear that the identification of a uniquely federal interest "does not, however, end the inquiry." *Id.*, at 507. Instead, this Court's precedents require "a significant conflict . . . between an identifiable federal policy or interest and the operation of state law." *Ibid.* (internal quotation marks and alterations omitted).

To craft a rule of decision for suits against federal procurement contractors, *Boyle* turned to the FTCA, which preserves the Federal Government's sovereign immunity against a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty," §2680(a). See *id.*, at 511. Because the Federal Government cannot be sued for exercising its discretion to

select helicopter designs, the Court concluded that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances" require displacement. *Id.*, at 512. But even then, not all tort suits arising out of design defects in federally procured equipment are preempted. The Court instead adopted a three-part test requiring preemption if (1) the United States approved precise specifications; (2) the equipment conformed to them; and (3) the supplier warned the United States about the dangers the specifications entailed. *Ibid.*

Under this approach, many suits are not preempted. For example, there would generally be no preemption when the procured equipment was a stock model, or when the Government's specifications were silent as to the complained-of defect in the product. *Id.*, at 509. And, the Court explained that preemption of all suits by military personnel against procurement contractors would be "too broad" a preemption rule because it would bar suits even when the Government did not instruct the contractor to produce equipment with the challenged feature. *Id.*, at 510.

*Boyle*'s reasoning contradicts the Fourth Circuit's analysis. *Boyle* addressed "a special circumstance" in which the contractor has a defense because "the government has directed a contractor to do the very thing that is the subject of the claim." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 74, n. 6 (2001). Hencely sued Fluor for conduct that, we assume (as the Fourth Circuit did), was not authorized by, but was even contrary to, federal instructions. See 120 F. 4th, at 430. Fluor does not dispute that military officials found it to have failed in its contractual obligations. It also does not dispute that the Army found this failure to be a cause of Hencely's injuries. Even granting that there is a "uniquely federal interest" in the regulation of military bases overseas, there would be no "significant conflict" be-

tween that interest and state-law negligence liability premised on a contractor's departure from military instructions. *Boyle*, 487 U. S., at 507.

An example *Boyle* gave confirms that *Boyle* does not justify the Fourth Circuit's rule. The Court thought it clear that in a case in which the Government asks a contractor for a certain result, and the contractor is sued for how it achieved that result, the suit is not preempted if the Government was silent about the conduct that allegedly violated state law:

> "If, for example, the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context." *Id.*, at 509.

The contract at issue in this case is "like the one for the hypothetical air conditioner, not the helicopter." *Saleh,* 580 F. 3d, at 22 (Garland, J., dissenting). The Fourth Circuit did not conclude "that the government required or authorized the contractor personnel at [Bagram Airfield] to do what state law forbids," and *Boyle* cannot be read to "protect a contractor from liability resulting from the contractor's violation of federal . . . policy." 580 F. 3d, at 22–23. The Government required Fluor to hire Afghan employees and to provide logistics for Bagram Airfield. But, it did not, Hencely contends, require Fluor to leave Nayeb unsupervised, allow him to walk alone for an hour after his shift, or permit him to obtain unauthorized tools with which he

could build a bomb.  Instead, on each score, the Army con-
cluded that Fluor *failed* express duties to the Government.
Given this, Hencely's suit premised on Fluor's negligence in
carrying out those duties is, under *Boyle*'s reasoning, not
preempted just as the hypothetical claims about the air-
conditioner would not be preempted.

None of this should come as a surprise to Fluor under ex-
isting statutes and regulations.  "Congress knows full well
how to make its intention to preclude private liability
known." *Saleh*, 580 F. 3d, at 26 (Garland, J., dissenting).
Congress gave some contractors express protection from
suits related to their activities.  42 U. S. C. §§233(a), (g)
(channeling suits against employees at certain federally
funded health centers); 50 U. S. C. §2783(b) (providing the
same for contractors carrying out an atomic weapons test-
ing program).  And, in the Defense Base Act, Congress
channeled claims by contractors' employees to an adminis-
trative process, see 42 U. S. C. §§1651(a), (c), but did not do
the same for suits by *soldiers* on military bases.  Moreover,
the Government advised Fluor that it would not have a
blanket defense based on its status as a military contractor.
See *Saleh*, 580 F. 3d, at 27 (Garland, J., dissenting).  Before
the suicide attack that injured Hencely, the Department of
Defense responded to concerns that its regulations "may
lead courts to deny contractors certain defenses in tort liti-
gation."  73 Fed. Reg. 16767 (2008).  The Department ob-
served that courts generally "absolv[e] contractors of liabil-
ity to third parties where the Government carried ultimate
responsibility for the operation." *Ibid.*  But, beyond that
context, the Department warned, contractors must "re-
search host nation laws and proposed operating environ-
ments" because existing law held "contractors accountable

for the negligent or willful actions of their employees, officers, and subcontractors."[1]  *Id*., at 16768.  The Department explained that *Boyle* did not protect nonprocurement contractors and that contractors should not expect "to avoid accountability to third parties for their own actions by raising defenses based on the sovereignty of the United States."  73 Fed. Reg. 16768.

### C

Since *Boyle* did not reach this case, the Fourth Circuit expanded it.  "'In the context of the combatant activities exception,'" it observed, "'the relevant question is *not* so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the state.'"  120 F. 4th, at 429 (quoting *Saleh*, 580 F. 3d, at 7; emphasis added).  Instead, the court reasoned, "it is the imposition *per se* of the state . . . tort law that conflicts with the federal policy of eliminating" state regulation of the military during wartime.  120 F. 4th, at 429 (internal quotation marks omitted).

That test sweeps too broadly.  The FTCA's combatant-activities exception forecloses suits "arising out of the combatant activities *of the military or naval forces, or the Coast Guard*."  28 U. S. C. §2680(j) (emphasis added).  Like the discretionary-function exception on which *Boyle* relied, the combatant-activities exception protects the Government's decisionmaking.  Accordingly, the Fourth Circuit seems to

_____

[1] The Department of Defense therefore did not share the dissent's alarm at the prospect of military contractors' being subject to foreign law.  *Post*, at 13–14, and nn. 5–7.  In fact, American courts have long decided cases relying on foreign law.  See, *e.g., Animal Science Products, Inc.* v. *Hebei Welcome Pharmaceutical Co.*, 585 U. S. 33, 37–41 (2018); *Canada Malting Co.* v. *Paterson S. S., Ltd.*, 285 U. S. 413, 421–422 (1932).  Regardless, the issue is academic here, as both sides invoked South Carolina law in this case, and, in the Fourth Circuit, Fluor did not "provid[e] any indication . . . how the outcome would be different under Afghan law."  120 F. 4th 412, 424, n. 4. (2024).

have recognized that the relevant federal interest is "fore-closing state regulation of the *military's* battlefield conduct and decisions." *In re KBR*, 744 F. 3d, at 350 (emphasis added). But, even assuming such an interest can preempt state law, "[n]o significant conflict exists between *that* interest and state law unless the challenged action can reasonably be considered the military's *own* conduct or decision and the operation of state law would conflict with that decision." *Badilla* v. *Midwest Air Traffic Control Serv., Inc.*, 8 F. 4th 105, 128 (CA2 2021).

The Fourth Circuit's decision not only extended, but contradicted, *Boyle*. *Boyle* created a defense for contractors only insofar as the suit challenged a decision of the Government that the contractor merely carried out. A conflict even with the new "uniquely federal interest" the lower courts have identified in military operations, then, would have to emerge from a state-law suit challenging the *military*'s decisions on the battlefield. The Fourth Circuit did not ask that question. To the contrary, it expressly concluded that resolving Hencely's claims under South Carolina law would not require "evaluat[ing] the reasonableness of military judgments." 120 F. 4th, at 424; contra, *post*, at 12 (opinion of ALITO, J.). But, it went on to find preemption in any case because it thought that the Government's "'interest in combat is *always* precisely contrary to the imposition of a non-federal tort duty.'" 120 F. 4th, at 426 (quoting *KBR*, 744 F. 3d, at 349; emphasis added). *Boyle*'s rationale justifies no such blanket preemption.

## D

Perhaps sensing this, Fluor and the Government argue that, even without *Boyle*, the Constitution's structure implicitly preempts any suit against a military contractor operating in a combat zone. See Brief for Respondents 30–33;

Brief for United States as *Amicus Curiae* 30. This argument has no basis in the text of the Constitution or our precedent.

All acknowledge that the Federal Government has "'broad and sweeping'" war powers. *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 58–59 (2006) (quoting *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968)). The Constitution assigns Congress the power to "declare War," "raise and support Armies," "provide and maintain a Navy," and "make Rules for the Government and Regulation of the land and naval Forces." Art. I, §8, cls. 11–13. The President is the "Commander in Chief of the Army and Navy of the United States" and militias in federal service. Art. II, §2, cl. 1. States, for their part, may not "engage in War, unless actually invaded." Art. I, §10, cl. 3.

But, the Constitution's grant of war powers does not imply that courts must reject any tort claim connected to a war zone, as the Fourth Circuit's rule requires.[2] See 120 F. 4th, at 429. The assignment of those powers to Congress and the Executive has never been understood to bar all war-related tort suits. To the contrary, barring other statutory or constitutional considerations, plaintiffs have been able to enforce their legal rights even when they are violated during war. Only a few years after the adoption of the Constitution, the Court addressed the case of Captain Little, commander of a United States frigate. *Little* v. *Barreme*, 2 Cranch 170 (1804) (Marshall, C. J.). Captain Little acted on the Secretary of the Navy's orders and seized a Danish vessel for violating American neutrality laws during the Quasi-War with France. *Id.*, at 176–178. The Court found

_____

[2] The dissent does not appear to disagree. See *post*, at 17. Nor does it defend the preemption rule applied below, even while it would find preemption on other grounds.

that the orders exceeded the President's statutory author-
ity and held that "Captain *Little* then must be answerable
in damages to the owner of this neutral vessel" despite a
seizure "with pure intention" to carry out U. S. military pol-
icy. *Id.*, at 179. In *Mitchell* v. *Harmony*, 13 How. 115
(1852), Colonel Mitchell seized property in Mexico during
the Mexican-American war that belonged to an American
merchant traveling with the military in the war zone. *Id.*,
at 129–130. The merchant sued, and the Court affirmed
the tort judgment against Colonel Mitchell. *Id.*, at 137. As
this history shows, the mere fact that the conduct here oc-
curred overseas in a warzone perhaps makes this a good
case for Congress to intervene, but it does not give courts a
license to bar all such suits on their own authority.[3]

Nor is Fluor protected from the consequences of its con-
duct simply because it was working for the Federal Govern-
ment and state law is at issue. "[T]here is an implied con-
stitutional immunity of the national government from state
taxation and from state regulation of the performance, by
federal officers and agencies, of governmental functions."
*Penn Dairies, Inc.* v. *Milk Control Comm'n of Pa.*, 318 U. S.
261, 269 (1943). For example, States ordinarily cannot "di-
rectly regulate or discriminate against" federal officers and
agencies. *United States* v. *Washington*, 596 U. S. 832, 835
(2022); see also *McCulloch* v. *Maryland*, 4 Wheat. 316, 436–
437 (1819). "But those who contract to furnish supplies or
render services to the government are not such agencies
and do not perform governmental functions." *Penn Dairies*,

---

[3] The dissent observes that these decisions applied the "bygone" federal
general common law before the Court declared that "[t]here is no federal
general common law" in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938);
they did not apply state law. *Post*, at 18. We fail to see the relevance of
this distinction. The pre-*Erie* "federal general common law" would have
been subject to structural constitutional law just as state law is today.
So, if the Constitution foreclosed tort claims arising from wartime activi-
ties under the rule that Fluor urges, these suits would have been barred
regardless of the source of the tort principles they relied on.

318 U. S., at 269. Accordingly, absent a statute to the contrary, States can regulate or tax federal contractors on the same terms as any private company, even where the party asserts an indirect burden on federal activities. See, *e.g.*, *James Stewart & Co.* v. *Sadrakula*, 309 U. S. 94, 104 (1940) (allowing state labor-law liability against a contractor constructing a federal building); *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 159–161 (1937) (upholding a tax imposed on a federal contractor despite a constitutional objection that doing so would burden the Federal Government by increasing its costs).

The Court has not hesitated to apply this principle in the military context. In *Penn Dairies*, the Court allowed a state milk-price regulation to apply to a military contractor providing milk to soldiers on a military base during the Second World War. 318 U. S., at 266–267, 278–279. The contractor argued that applying the regulations to its military contracting operations was unconstitutional, because Congress alone has the power to raise and support armies, and the regulation interfered with the exercise of that power. *Id.*, at 268–269; see Art. I, §8, cl. 12. The Court rejected that argument. It explained that while Congress's enumerated powers enable it to "declare state regulations like" the one at issue "inapplicable to sales to the government," the state law was not preempted because the Court could not "find in Congressional legislation . . . any disclosure of a purpose to immunize government contractors from local price-fixing regulations which would otherwise be applicable." 318 U. S., at 269, 278.

Instead, without a federal statute, contractors ordinarily have a constitutional defense only when the contractor is being sued precisely for accomplishing what the Federal Government requested. In *Yearsley*, a contractor, acting under military orders, built dikes on the Missouri River and "washed away a part of petitioners' land" as a result. 309 U. S., at 19. The landowners sued and secured a judgment

against the contractor. *Id*., at 20. This Court reversed. The Court explained that "if th[e] authority to carry out the project was validly conferred . . . there is no liability on the part of the contractor for executing its will." *Id*., at 20–21. But, by its own terms, *Yearsley* was limited: "The Court contrasted with *Yearsley* cases in which a Government agent had 'exceeded his authority' or the authority 'was not validly conferred'; in those circumstances, the Court said, the agent could be held liable for conduct causing injury to another." *Campbell-Ewald Co.* v. *Gomez*, 577 U. S. 153, 167 (2016) (quoting *Yearsley*, 309 U. S., at 21). Because Fluor is alleged to have acted outside the authority the military granted it, it does not attempt to invoke a *Yearsley* defense. And, we decline to extend *Yearsley* to bar allegations such as Hencely's.

## III

The Fourth Circuit's decision held Hencely's claims preempted even though the conduct complained of was neither ordered nor authorized by the Federal Government. No provision of the Constitution and no federal statute justifies that preemption of the State's ordinary authority over tort suits. Nor does any precedent of this Court command such a result. Therefore, we vacate the judgment of the Fourth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 24–924

---

## WINSTON TYLER HENCELY, PETITIONER *v.* FLUOR CORPORATION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 22, 2026]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE KAVANAUGH join, dissenting.

May a State regulate security arrangements on a military base in an active warzone? May state judges and juries pass judgment on questions that are inextricably tied to military decisions that balance war-related risks against long-term strategic objectives? In my judgment, the answer to these questions must be "no," and for that reason, this state-law tort case is preempted by the Constitution's grant of war powers exclusively to the Federal Government.

The event that gave rise to this case was a tragic breakdown in security at Bagram Airfield in Afghanistan in 2016, when the United States military was engaged in combat in that theater. Ahmad Nayeb, an Afghan national employed to work on the base, detonated a suicide bomb that killed 3 U. S. soldiers and 2 civilians and injured 17 others.

In the years before this event, Taliban supporters repeatedly attacked Bagram, but the military nevertheless decided for strategic reasons to adopt a policy known as "Afghan First," which required contractors working on the base to maximize the employment of Afghans. Under that policy, military officials vetted Nayeb, a former Taliban member, and cleared him to work on the base. Giving a person with Nayeb's background regular access to Bagram presented an obvious risk, but the decisionmakers

apparently concluded that long-term foreign policy and defense objectives justified that danger. As a result, a subcontractor for Fluor Corporation, a defense contractor engaged in work on the base, employed Nayeb. Fluor had responsibility for supervising Nayeb's conduct, and Fluor allegedly failed to provide adequate supervision.

Among those injured when Nayeb detonated his bomb was petitioner, former Army Specialist Winston Tyler Hencely, who suffered severe and permanent injuries. Barred by sovereign immunity from suing the Federal Government, petitioner brought this diversity suit against Fluor and asserted tort claims under South Carolina law. Like all members of the military wounded in the service of our country, petitioner deserves a full measure of support from the American people, who owe him a debt that can never be fully repaid. But this state-law tort suit is not the way to give petitioner what he is due.

Under the Constitution, the power to make war and conduct combat operations is entrusted exclusively to Congress and the President. See Art. I, §8, cls. 1, 11–16; Art. II, §1, cl. 1, §2, cl. 1. The Constitution expressly excludes the States from this field, Art. I, §10, cl. 3, and thus no state law, including state tort law, may intrude on the Federal Government's authority over combat-related operations.

This suit violates that cardinal principle. Among other concerns, the trial proceedings that will result from today's decision are likely to implicate the Government's policy decisions about the operation of Bagram Airfield during the War on Terror. Fluor has stated that it will attempt to assign blame for the bombing to the military. In doing so, Fluor is likely to challenge the military's decision to give Nayeb access to the base in the first place, as well as the sufficiency of the military's periodic reassessments of his trustworthiness. And to support this defense, Fluor may demand discovery of sensitive Government documents and may depose and cross-examine military commanders about

policy decisions that involved a delicate and contestable balancing of wartime interests. In the end, a jury may be asked to decide whether petitioner's injuries were caused by the negligence or bad judgment of military decisionmakers and the officers responsible for the operation of the base. And to make matters worse, there is a possibility that the case will be decided under the principles of Afghan law in effect in 2016, even though simply ascertaining those principles would be a daunting task.

Because petitioner's state-law claims intrude on the Federal Government's exclusive power to make war and conduct combat operations, the Constitution preempts them.

## I

## A

The Constitution makes federal law the "supreme Law of the Land," Art. VI, cl. 2, and over the years, this Court has identified a variety of circumstances in which federal law preempts state law. In this case, the opinion of the Court stresses the two situations in which preemption is most evident: where a federal law expressly preempts state law and where it is impossible for a regulated party to comply with both federal and state law. See *ante*, at 1, 5. But these two categories do not constitute an exhaustive list. Our precedents squarely establish that the Constitution and other federal laws may also *impliedly* preempt state law. *Kansas* v. *Garcia*, 589 U. S. 191, 202–203 (2020). And most pertinent here, we have long recognized that federal law preempts state laws that intrude on the powers that the Constitution confers exclusively on the Federal Government, as well as laws that substantially interfere with the operation of the Federal Government's organs or the work of federal officers.

Our decisions in this vein began at least as early as *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), where the Court held that Maryland could not tax the Second Bank of

the United States. Writing for the Court, Chief Justice Marshall noted that some powers, including control over federal instrumentalities like the Bank, belong exclusively to the Federal Government. *Id.*, at 429. Thus, Maryland could not control the Bank, and because the power to tax could be used to control—and indeed destroy—the Bank, the State could not tax it. *Id.*, at 431. Chief Justice Marshall stated the holding of the Court in unequivocal terms: "[T]he States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id.*, at 436. That principle doomed Maryland's tax even though no provision of federal law expressly preempted the state law and even though the Court did not suggest that the Bank was incapable of paying the tax. Rather, the Court inferred the preemptive effect of federal law from the structure of the Constitution. See *id.*, at 430–431.

Five years later, the Court's decision in another landmark case involving the Second Bank of the United States reaffirmed the principle of implied preemption recognized in *McCulloch*. Writing for the Court in *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), Chief Justice Marshall explained that some state incursions into federal operations are "so objectionable" that federal law need not say anything to preempt them. *Id.*, at 865. For example, the "collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public . . . are protected, while in the line of duty; and yet this protection is not expressed in any act of Congress." *Ibid.* Thus, Ohio, like Maryland in *McCulloch*, was barred from taxing the Bank simply because of the Constitution's delineation of federal and state authority.

*McCulloch* and *Osborn* were early cases identifying fields that are "exclusively federal, because made so by constitutional or valid congressional command," or because they "so

vitally affec[t] interests, powers and relations of the Federal Government as to require uniform national disposition." *United States* v. *Standard Oil Co. of Cal.*, 332 U. S. 301, 307 (1947). In such areas, this Court does not apply a presumption against preemption. That presumption is grounded in respect for state sovereignty, so it applies to fields the "'States have traditionally occupied.'" *Wyeth* v. *Levine*, 555 U. S. 555, 565 (2009) (quoting *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470, 485 (1996)). But when state law intrudes in an exclusively federal domain, the rationale for the presumption does not apply. In those fields, the "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates 'in a field which the States have traditionally occupied.'" *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 507 (1988) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)). In other words, the "fact that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U. S., at 508 (emphasis deleted).

*Osborn*, as noted, enumerated several exclusive federal domains into which States may not intrude, and later cases reaffirmed and further developed that list. For example, the Court held that States cannot prosecute federal agents for their official acts. *In re Neagle*, 135 U. S. 1, 75–76 (1890); see *Tennessee* v. *Davis*, 100 U. S. 257, 262–263 (1880) (quoting *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 363 (1816) (Johnson, J., concurring in judgment)). They cannot impose qualifications for membership in Congress that go beyond those set out in the Constitution. *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 806 (1995). Nor can States enact qualifications for federal employees that surpass the minimum qualifications imposed by federal law. *Johnson* v. *Maryland*, 254 U. S. 51, 57 (1920). States are also barred from singling out the Federal Government for unfavorable treatment in contracting. *United States* v.

*Washington*, 596 U. S. 832, 839 (2022).  They cannot impose tort liability on federal contractors for the performance of their contractual duties.  *Yearsley* v. *W. A. Ross Constr. Co.*, 309 U. S. 18, 20–21 (1940).  And they cannot dictate the priority of federal liens that arise under a nationwide program.  *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 726 (1979).

  In these situations, the Court found that constitutional structure dictated preemption, but today's majority largely disregards this body of precedent.  The majority is certainly correct that "'[t]here is no federal pre-emption *in vacuo*,'" *ante*, at 5, and preemption cannot be based on "'some brooding federal interest'" or a "'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'"  *Garcia*, 589 U. S., at 202.  We have been presented with and have rebuffed preemption arguments that rested on such airy grounds.  See, *e.g.*, *Arizona* v. *United States*, 567 U. S. 387, 411–415 (2012): *id.*, at 424–426 (Scalia, J., concurring in part and dissenting in part); *id.*, at 437–438 (THOMAS, J., concurring in part and dissenting in part); *id.*, at 441 (ALITO, J., concurring in part and dissenting in part).[1]  But any argument that constitutional structure

––––––––

  [1] In that case, a state law required law enforcement officers to contact federal authorities regarding the immigration status of a detainee if they reasonably suspected that he or she was in this country unlawfully.  *Arizona*, 567 U. S., at 411.  Even if this detention did not exceed the length of time permitted by the Fourth Amendment, the Federal Government argued that this state-law requirement was preempted because its breadth conflicted with the Government's enforcement policy, which gave priority to the removal of those illegal aliens who had criminal records or presented a special danger to the community.  See Brief for United States in *Arizona* v. *United States*, O. T. 2011, No. 11–182, pp. 43–52.  Although divided on other issues, the Court unanimously rejected that argument.  Just because the state law might have led to phone calls or emails that federal immigration officers did not wish to receive provided no sound basis for preemption.  See, *e.g.*, *Arizona*, 567 U. S., at 412–413; *id.*, at 442–446 (ALITO, J., concurring in part and dissenting in part).

cannot itself preempt state law comes more than two centuries too late.

## B

Preemption based on constitutional structure is especially important when state law intrudes upon the Federal Government's exclusive authority to conduct relations with other nations or to wage war. As the Court has repeatedly explained, the "Federal Government . . . is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." *Hines* v. *Davidowitz*, 312 U. S. 52, 63 (1941). Indeed, "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Ibid.*; see also *United States* v. *Belmont*, 301 U. S. 324, 330–331 (1937) ("Governmental power over external affairs is not distributed, but is vested exclusively in the national government . . . and cannot be subject to any curtailment or interference on the part of the several states"); *Zschernig* v. *Miller*, 389 U. S. 429, 432 (1968) (the Constitution permits no "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress"); *Saleh* v. *Titan Corp.*, 580 F. 3d 1, 11 (CADC 2009) (Silberman, J.) ("The states (and certainly foreign entities) constitutionally and traditionally have no involvement in federal wartime policy-making").

We have applied this principle in numerous preemption cases. In *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363 (2000), we held that a federal statute imposing sanctions on Burma preempted a state law banning the purchase of goods produced by companies that did business with that nation. *Id.*, at 373–374. We reached that conclusion even though it would have been possible to comply with both the federal and state laws. *Id.*, at 379–380. Similarly, in *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396 (2003), we held that a federal executive agreement preempted a

state statute that attempted to facilitate reparations for Holocaust survivors. *Id.*, at 419, and n. 11, 427.

As with foreign affairs more broadly, the Constitution assigns the power to make war exclusively to the Federal Government. Congress is given the power to declare war, raise armies, provide a Navy, and make rules governing the Armed Forces. Art. I, §8, cls. 1, 11–16. And the President is made the Commander in Chief of the Armed Forces. Art. II, §2, cl. 1. The Constitution then explicitly strips States of any similar powers. States may not "keep Troops, or Ships of War in time of Peace," or "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." Art. I, §10, cl. 3. The "Constitution's text, across several Articles, strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense." *Torres* v. *Texas Dept. of Public Safety,* 597 U. S. 580, 590 (2022). The framing generation well understood this point. "The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy." *Id.*, at 592.

\*   \*   \*

In sum, we have long recognized that the Constitution itself may demand preemption when a state law intrudes upon an area of exclusive federal authority. And because the Constitution gives the Federal Government exclusive authority over foreign affairs and the conduct of wars, federal law preempts all state law that substantially interferes with the Government's exercise of those powers.

## II

Applying state (or foreign) tort law in this case would substantially interfere with the Government's ability to wage war and, in particular, with its ability to implement its preferred security policies at Bagram Airfield, which for many years had been regularly attacked by Taliban supporters.

In February 2007, a suicide bombing on the base killed 23 and injured 20 more. A June 2009 rocket attack killed two soldiers and injured at least six others. In May 2010, insurgents wearing U. S. Army uniforms killed an American contractor and wounded nine servicemembers. A November 2013 rocket attack killed two civilian contractors, and a December 2015 suicide bombing killed six American servicemembers.[2]

In light of this history, military planners had strong reasons to worry about base security, but they also had in mind the United States' strategic objectives. 554 F. Supp. 3d 770, 776, n. 7 (SC 2021). President George W. Bush laid out those aims as follows: "Our goal in Afghanistan is to help the people of that country to defeat the terrorists and establish a stable, moderate, and democratic state that respects the right of its citizens, governs its territory effectively, and is a reliable ally in this war against extremists and terrorists."[3] Later, as President Obama looked forward to the day when American troops could come home, he added that the United States supported "open[ing] the door to those Taliban who abandon violence and respect the human rights of their fellow citizens."[4]

Balancing these strategic objectives and Bagram's security needs, military decisionmakers adopted a policy that

––––––––––

[2] P. Wellman, A Timeline of Important Moments at Bagram Airfield from 2001–2021, Stars & Stripes (July 2, 2021), https://www.stripes .com/theaters/middle_east/2021-07-02/bagram-airfield-timeline-of-events -since-2001-2026849.html (archived at https://perma.cc/J3Y7-MFNQ).

[3] President Bush Discusses Progress in Afghanistan, Global War on Terror (Feb. 15, 2007), https://georgewbush-whitehouse.archives.gov/ news/releases/2007/02/20070215-1.html (archived at https://perma.cc/ A6SK-VVBD).

[4] Remarks By the President in Address to the Nation on the Way Forward in Afghanistan and Pakistan (Dec. 1, 2009), https://obamawhitehouse .archives.gov/the-press-office/remarks-president-address-nation-way-forward-afghanistan-and-pakistan (archived at https://perma.cc/Z3YB-M88H).

entailed what they must have thought were tolerable and manageable risks. The policy manifested trust in the Afghan people, sought to promote economic development, and attempted to further the process of bringing former Taliban members back into the fold.

This was the military's "Afghan First" policy, which gave heavy preference to the hiring of Afghans. In a March 2006 memorandum, the Commanding General of the Combined Forces Coalition in Afghanistan directed all military commanders to "make every attempt, within legal and regulatory limits, to use available Afghan services." Motion for Summary Judgment in No. 6:19–cv–00489 (D SC, Feb. 26, 2021), ECF Doc. 128–18, Exh. 16, p. 2. The memo added that "[w]henever possible, we should plan on providing Afghans with training which will add marketable skills to the population." *Ibid.* The memo recognized that this directive would risk some adverse consequences, but it justified the program on the ground that it would "provide opportunities for economic expansion, increased entrepreneurship, and skills training for the people of Afghanistan." *Ibid.* "As long as we can legally hire Afghans to provide services or products," the memo proclaimed, "we shall do so." *Ibid.*

The memo therefore directed military officials to award contracts to Afghans, rather than American contractors, whenever possible. And when officials awarded contracts to American companies like Fluor, the memo stated that "[o]rders are to be scoped to maximize employment of Afghans." *Ibid.* Commanders were instructed to set goals and write reports regarding the percentage of Afghans employed under the contracts they administered, and the memo challenged commanders to "be creative and aggressive in carrying out the Afghan FIRST program." *Id.*, at 3. The memo ended with the proclamation that "[t]his is a powerful way to contribute meaningfully to our campaign end state." *Ibid.*

The Afghan First program was incorporated into Fluor's contract. Specifically, §1.07(b) of the relevant task order required Fluor to "hire [host nation] personnel and Subcontractors to the maximum extent possible." ECF Doc. 128–19, Exh. 17, p. 6. According to Fluor's security director, "[p]ractically, this meant that the Military required Fluor to use [local nationals]. In fact, if Fluor employed persons other than Afghan nationals, the Military usually required Fluor to justify its decision." ECF Doc. 128–7, Exh. 5, p. 17.

It was under this program that Nayeb was cleared for employment on Bagram and then hired by one of Fluor's subcontractors. Because of Nayeb's past Taliban membership, clearing him entailed an obvious risk. But the military concluded that the United States' strategic objectives justified that danger. The military relied on Fluor to supervise Nayeb's conduct on the base, and this arrangement led to the bombing that seriously injured petitioner.

Based on what is known about the events leading to the bombing, it may well be that both the military and Fluor are responsible for petitioner's injuries. Under South Carolina law, they could be jointly and severally liable, but because the military is shielded by sovereign immunity, Fluor is potentially liable for all the compensatory damages that petitioner may be awarded. See *Green* v. *McGee*, 446 S. C. 343, 350, 919 S. E. 2d 903, 906 (2025); 120 F. 4th 412, 424 (CA4 2024). Any negligence on the part of the military would not diminish Fluor's liability for compensatory damages.

At this point, however, we do not know whether South Carolina law will be applied on remand. (I will discuss that question below.) But even if the rule of joint and several liability applies, Fluor will be free to try to show that the military was solely responsible for petitioner's injuries, and Fluor has stated that it will pursue that strategy. See *id.*, at 424–425 (Fluor plans to try the military as the "empty chair"). Even if this attempt to shift all blame to the

Federal Government does not work, Fluor could also use evidence of the military's responsibility as a defense against petitioner's claim for punitive damages. See App. to Pet. for Cert. 150a. For these reasons, adjudication of Fluor's defense is very likely to entail an evaluation of the way the Federal Government assessed the risks and benefits of Nayeb's employment, and this would impermissibly intrude on the Federal Government's exclusive war powers.

This suit threatens many other harms to federal interests as well. The parties may seek discovery of sensitive documents about security threats at Bagram and about the trade-offs reflected in setting security policy. The United States will have to decide whether public disclosure of such documents is consistent with the Nation's defense and foreign policy interests, and its only way to resist their disclosure may be the invocation of the state-secrets privilege. For good reason, the Government does not lightly assert that privilege; it is "the option of last resort." *General Dynamics Corp.* v. *United States*, 563 U. S. 478, 492 (2011). But in this case, the Government has not yet ruled it out. Brief for United States as *Amicus Curiae* 21, n. 1.

Depositions and trial testimony by military officers responsible for setting and implementing base security policy and protocols may pose similar problems and may also interfere with these officers' current responsibilities regarding urgent national security challenges. Members of the military who investigated the bombing may likewise be deposed, subpoenaed to testify, and cross-examined about their conclusions regarding Fluor's conduct, and this could take a toll.

All these harms will be compounded if active-duty servicemembers can bring state tort suits like petitioner's. Having active-duty servicemembers depose their commanders and question military judgments could interfere with military discipline and the proper chain of command.

The shadow of state tort liability may also undermine the Government's use of contractors to perform tasks that are closely related to actual combat operations. See 120 F. 4th, at 427 (petitioner has acknowledged that Fluor "was integrated into combatant activities" on the base (internal quotation marks omitted)); accord, 554 F. Supp. 3d, at 774. For a variety of reasons, federal policy has increased the use of contractors to provide security in dangerous locales. And in doing so, contractors take directions from the military. But "[f]aced with the specter of tort liability, . . . a contractor would have to balance battlefield needs as dictated by military command against what a judge or jury might say years after the fact." Brief for Retired Senior Military Officers as *Amici Curiae* 22. Putting contractors in this conflicted position could lead to adversarial relationships with military commanders.

Applying state tort law to events that occur on a military base in an active warzone may also lead to vexing choice-of-law problems—and those problems are certainly present here. This is a diversity case filed in federal court in South Carolina, so that State's choice-of-law rules govern. See *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496 (1941). Under those rules, "the substantive law governing a tort action is determined by the lex loci delicti, the law of the state in which the injury occurred." *Boone* v. *Boone*, 345 S. C. 8, 13, 546 S. E. 2d 191, 193 (2001). Hencely's injury occurred in Afghanistan. So a routine application of South Carolina's *lex loci delicti* rule[5] would call for a trial under

---

[5] The result might be the same under choice of law rules like the government-interest test or the test in the Restatement (Second) of Conflict of Laws §145 (1969). See, *e.g.*, *M. M.* v. *Islamic Republic of Iran*, 708 F. Supp. 3d 22, 47–48 (DC 2023); *Sadiqyar* v. *Mission Essential, LLC*, 2020 WL 5210850, *4, n. 3 (SD Ohio, Sept. 1, 2020) ("California choice of law rules, as stated in the 'governmental interests test,' might permit the application of Afghan law").

Afghan law as it existed in 2016.[6]  Just identifying the rel-
evant principles in that body of law would be a challenge.[7]
And if the application of state law would impermissibly in-
trude in an exclusively federal domain, then adjudicating
this case under foreign law would be even worse.

———————

[6] It is possible that a South Carolina court would not apply the *lex loci
delicti* rule.  South Carolina courts, like those in many other States, will
not apply another jurisdiction's law when doing so would contravene
their own State's public policy.  *Boone*, 345 S. C., at 13, 546 S. E. 2d, at
193.  But determining whether Afghan law contravenes South Carolina's
public policy would seem to require the identification of the relevant
principles of Afghan law.  And as petitioner noted at oral argument, some
decisions "have applied Afghan law in situations like this."  Tr. of Oral
Arg. 24; see, *e.g.*, *M. M.*, 708 F. Supp. 3d, at 47–48 (suicide bombing in-
volving federal contractor); *Haskins* v. *Midwest Air Traffic Control Serv.,
Inc.*, 2016 WL 3653531, *5 (ND Ill., July 8, 2016) (plane crash in Afghan-
istan involving American passenger).  In fact, Fluor itself has had to lit-
igate claims under Afghan law.  *Allen* v. *Fluor Corp.*, 2017 WL 2618821,
*5 (ND Tex., June 15, 2017).  And other decisions have applied Iraqi law
to similar tort claims against American military contractors.  See, *e.g.*,
*McGee* v. *Arkel Int'l, LLC*, 671 F. 3d 539, 543 (CA5 2012); *Al-Quraishi* v.
*Nakhla*, 728 F. Supp. 2d 702, 763 (Md. 2010).
[7] Despite its length (2416 Articles), the 1977 Afghan Civil Code gives
only cursory treatment to standard tort issues and omits discussion of
some key topics altogether.  The Code states simply that "[i]f harm is
inflicted on another due to . . . fault, the perpetrator shall be obligated to
pay compensation."  Civil Code of the Republic of Afghanistan, Art. 776
(1977 Civil Code) (transl. by Afghanistan Legal Education Project 2014).
The Code similarly treats causation and joint and several liability in one-
sentence provisions.  Arts. 783, 789.  If these bare-bones provisions sup-
ply insufficient guidance for courts, then the problems multiply.  Under
Afghanistan's now apparently defunct 2004 Constitution, when no spe-
cific provision of law on a question could be found, courts were instructed
to consider "*Hanafi* jurisprudence"—a Sharia legal tradition—and to
rule "in a way that attains justice in the best manner."  Art. 130; accord,
1977 Civil Code, Art. 2.  Cf. *Center Khurasan Constr. Co.* v. *JS Int'l, Inc.*,
2021 WL 5882342, *2 (D Md., Dec. 10, 2021) ("Ascertaining Afghan law
is no simple task"); *Global Fleet Sales, LLC* v. *Delunas*, 203 F. Supp. 3d
789, 805 (ED Mich. 2016) ("[T]he Court would be ill-equipped to apply
the law of Afghanistan").

### III

Despite this suit's intrusion into a domain of exclusive federal authority, petitioner contends that his suit is not preempted for two main reasons: (1) the Federal Tort Claims Act's retention of sovereign immunity for "combatant activities . . . during time of war" does not apply here, 28 U. S. C. §2680(j), and (2) our decision in *Boyle* does not dictate preemption. Neither argument provides a ground for rejecting preemption.

### A

The Federal Tort Claims Act (FTCA) does not help petitioner because that law simply does not speak to the question of preemption. The FTCA provides a limited waiver of the United States' sovereign immunity from suit but sets out certain exceptions to that waiver, and one of these exceptions covers claims "arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." *Ibid.* This exception protects the Federal Government from liability for petitioner's injuries, but its terms do not address the question whether state tort law applies to a federal contractor carrying out federal wartime policies on a military base in theater. Indeed, that provision does not even give rise to an inference of non-preemption. Since the FTCA concerns the Government's sovereign immunity, and since government contractors enjoy no such immunity, that Act would be a strange place to include a provision shielding such contractors from state-law liability. If anything, §2680(j) lends support to preemption because it is based on the same strong federal interest that provides the basis for preemption here: the exclusive authority of the President and Congress to decide how combat-related activities should be conducted.

## B

*Boyle,* likewise, does not support petitioner's argument. Petitioner urges us not to "extend" the holding in *Boyle*, Brief for Petitioner 31, but that argument rests on the false premise that *Boyle* governs the preemption of all tort claims against government contractors. *Boyle*'s holding concerns the preemption of claims based on a particular federal interest, namely, the Government's interest in "the performance of federal procurement contracts." 487 U. S., at 506. When preemption is sought on the ground that the application of state law would impermissibly undermine that interest, *Boyle* provides a test for determining whether application of the state law in question would actually have that effect. It asks whether "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.*, at 512. If all those requirements are met, *Boyle* infers that any dangerous defect in the product "may well reflect a significant policy judgment by Government officials." *Id.*, at 513. Therefore, imposing liability on a contractor for an allegedly dangerous feature of the design the Government required would pressure contractors to deviate from that design, and that would undermine the Government's interest in "the performance of federal procurement contracts" in accordance with its wishes. *Id.*, at 506.

The preemption claim in this case rests on a different basis. The federal interest at stake is not the performance of a procurement contract but the interest in making foreign-affairs and strategic military decisions without state interference. That interest did not figure in *Boyle*'s preemption analysis. As the Court notes, the claim in *Boyle* did not involve combatant activities. *Ante*, at 6. It concerned a helicopter crash off the coast of Virginia. Although the plaintiff was a Marine and the helicopter was designed for military

use, the Court treated the contract under which the helicopter was procured like any other government contract. If the helicopter had been designed and procured for a civilian agency, the Court's analysis would have been the same.

If anything, *Boyle* lends support to preemption here because it held state law was preempted even in the absence of any relevant express preemption provision. And it recognized that a state tort claim may be preempted if it intrudes on an area involving a "uniquely federal interes[t]." 487 U. S., at 504. But its relevance for present purposes stops there.

C

One other argument offered by the majority requires a response. The majority argues that federal law does not preempt all state-law claims "connected to a war zone." *Ante*, at 13. But the claim here is not simply one with some sort of connection to a "zone" in which there was an ongoing war. Rather, it is a claim that is intertwined with policy decisions regarding the way in which the war in Afghanistan should have been conducted.

The Court suggests that "barring other statutory *or constitutional considerations*, plaintiffs have been able to enforce their legal rights even when they are violated during war." *Ibid.* (emphasis added). Here, however, it is precisely because of "constitutional considerations" that petitioner's state-law claims are preempted.

In support of the proposition that a state-law tort claim may by based on war-related conduct, the Court cites three cases, but they are all far afield. The first, *Penn Dairies, Inc.* v. *Milk Control Comm'n of Pa.*, 318 U. S. 261 (1943), concerned the application of a Pennsylvania milk-control law to a base in the State. To state the obvious, state regulation of milk prices for a stateside military base presents a far lower risk of intrusion into federal war powers than

state regulation of defense contractors' activities in a foreign warzone.

The other two cases are the products of a bygone legal era. See *Little* v. *Barreme*, 2 Cranch 170 (1804); *Mitchell* v. *Harmony*, 13 How. 115 (1852). Both cases predated *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), and neither applied state law.[8] *Little* involved the seizure of a vessel in the Caribbean and appears to have applied admiralty or general federal common law. See 2 Cranch, at 179. *Mitchell* concerned the seizure of a merchant's personal property in Mexico during the Mexican-American War. 13 How., at 128. It, too, appears to have applied general federal common law. See *id.*, at 135–136.[9] Thus, neither case addresses whether the Constitution preempts the application of *state* tort law to those carrying out federal wartime policies on a foreign military base.

---

[8] Additionally, both cases arose when the United States had plenary sovereign immunity from tort suits. During that period, wronged parties often obtained judgments against the officers who engaged in the contested conduct (and did not enjoy qualified immunity), and Congress often passed private bills indemnifying the officers. See J. Pfander, *Iqbal*, *Bivens*, and the Role of Judge-Made Law in Constitutional Adjudication, 114 Pa. St. L. Rev. 1387, 1394 (2010). That is what appears to have happened in these cases. See *id.*, at 1393–1394 (the Court's opinion in *Little* "reflected the Court's perception that Congress bore responsibility for indemnifying Captain Little").

[9] The majority says that the "source of the tort principles" in *Little* and *Mitchell* is irrelevant because all tort claims would be preempted under Fluor's rule. *Ante,* at 14, n. 3. But I do not contend that the Constitution bars *all* tort claims against Fluor, regardless of their source. Because the Constitution makes war an exclusively federal domain, federal law— including federal tort law—governs. State tort law, by contrast, has no role to play in war. *Little* and *Mitchell* are consistent with that dichotomy because they applied federal common law, not state law. The question of what, if any, federal tort claims Hencely could bring against Fluor is not presented here.

\*    \*    \*

The Constitution divides authority between the Federal Government and the States in many areas, but not when it comes to war.  War is the exclusive domain of the Federal Government, but the Court allows state (or foreign law) to encroach on that domain.  The Constitution precludes that encroachment, and therefore petitioner's suit is preempted. Because the Court holds otherwise, I respectfully dissent.